[Crim. No. 10030. In Bank. Sept. 14, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. EMIL JOHN
CROVEDI, Defendant and Appellant.

Max Solomon and Burton Marks for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, and Ronald H. Tochterman, Deputy Attorney General, for Plaintiff and Respondent.

PEEK, J.—Emil John Crovedi appeals from a judgment of conviction entered after a jury found him guilty of conspiracy to commit grand theft, grand theft and burglary.

On May 22, 1964, defendant Crovedi, together with Lester Harris, Leone Thomas Riccio and Guy Phillip Mendolia, was charged in count I of an indictment with conspiracy to commit grand theft (Pen. Code, § 182). In counts II and III of the indictment Crovedi, together with only Mendolia, was charged

respectively with grand theft (Pen. Code, § 487) and with burglary (Pen. Code, § 459). Guy Phillip Mendolia was never apprehended. Crovedi, Harris and Riccio were duly arraigned, and their joint trial was set for November 30, 1964. However, due to illness of his counsel Lester Harris was unable to proceed to trial on that day, and his trial was continued to February 23, 1965. The trial of Crovedi and Riccio commenced as scheduled on November 30, 1964, and the jury found Crovedi guilty of all crimes charged. Sentence was imposed upon him for the crime of grand theft. Riccio was found not guilty of conspiracy to commit grand theft, the only crime charged against him.

The charges brought against all defendants were the result of their alleged participation in a conspiracy, formed in Chicago and consummated in California to commit a series of jewel thefts.

The single issue of substance in this case is whether defendant Crovedi was denied his right to the assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the federal Constitution, and article I, section 13, of the state Constitution. The facts relevant to this inquiry follow:

Prior to his arraignment Crovedi retained Morris B. Chain, an experienced criminal defense attorney, to represent him and conduct his defense. Mr. Chain did represent Crovedi in all pretrial proceedings and during the first four days of the trial, but on December 5, 1964, a Saturday, he suffered a heart attack and was hospitalized. On the following Monday, Milton M. Younger, Mr. Chain's law partner, appeared in court to advise of Mr. Chain's incapacity and to request a two-week continuance so that the doctor would have "sufficient opportunity to complete the diagnosis and report both to me so I can report to the court and report to Mr. Chain how soon he will be able to return." The motion was not opposed by the prosecution, and the matter was continued to December 21, 1964, with the following admonition to Mr. Younger: "I trust that in the interim either you will be able to ascertain your correct position or shall be able, ready to proceed to the continuation of this case through Mr. Chain, or do whatever arrangements become necessary in the interim."

Following the hearing Mr. Younger contacted Mr. Chain's doctor and was informed that Mr. Chain was recovering satisfactorily and that it was expected that he would be able to return to his office in January and to courtroom work in the middle of February. Mr. Younger requested that the doctor

prepare a medical report to be presented to the court on December 21.

On December 14 the prosecuting attorney, Mr. Leddy, advised Mr. Younger "that the Court expected to proceed with the trial on the 21st of December, and that if he did not expect to represent Mr. Crovedi himself that he should contact Mr. Crovedi immediately so that Mr. Crovedi could make other plans." On December 15, Mr. Younger and Mr. Leddy conferred with the court in order to review the situation, and at that time Mr. Leddy "suggested to Mr. Younger that he notify Mr. Crovedi by wire if Mr. Crovedi wanted counsel other than Mr. Younger."

On December 18 Mr. Leddy advised Mr. Younger that the court had decided that it would appoint him to represent Mr. Crovedi during the remainder of the trial. Mr. Younger's reaction to this information was one of surprise, but he arranged to meet with Mr. Leddy in the court's chambers that afternoon to discuss the matter. At that meeting the court indicated to Mr. Younger that it did in fact intend to appoint him to proceed with the trial in Mr. Chain's absence. Mr. Younger then asked that the court consider two alternatives: (1) that the case be continued for six weeks so that Mr. Chain could return, or (2) that the court declare a mistrial as to Crovedi pursuant to mutual stipulation, allowing the Riccio case to continue on December 21 as scheduled, and try the Crovedi case along with the Harris case, which was already set for trial on February 23 due to the illness of Mr. Harris' counsel. Notwithstanding these alternatives, the court reiterated its determination to appoint Mr. Younger as Crovedi's counsel and to proceed with the Crovedi-Riccio trial on December 21.

On December 21 Mr. Younger appeared with Crovedi, and proceedings took place out of the presence of the jury relative to the matter of Crovedi's representation by counsel. Those proceedings, together with those occurring on December 28, are quoted and summarized in the Appendix, and the following situation is thereby disclosed: The medical report presented to the court expressed the opinion that Mr. Chain would be able to return to courtroom work in the middle of February, or approximately seven weeks after the December 21 hearing. Defendant Crovedi expressed a desire that the trial be continued for that period so that he could be represented by his retained counsel, and codefendant Riccio through counsel expressed a willingness to have his own case continued along with that of Crovedi and to enter appropriate waivers. The

suggestion in this regard was that all three defendants be tried jointly on the date previously set for the trial of co-defendant Harris, February 23. It was further suggested that by means of waivers and stipulations the testimony introduced before Mr. Chain's illness could be read to the jury at that future time, thus eliminating any need for the return of witnesses who had already testified, as well as solving any problem as to the jury's retention of that testimony. The prosecutor, however, emphasized that the contemplated primary line of defense (to wit, duress), as revealed by the opening statement of Mr. Chain, was not a matter requiring significant preparation, so that present substitution with a short continuance for preparation would be proper. He further indicated that the convenience of certain unspecified out-of-state witnesses, who had not yet testified at the date of Mr. Chain's illness, should be carefully considered.[1]

The court ruled that a continuance for the period requested by defendant Crovedi would be unreasonable under the circumstances and, over the vigorous protest of both Crovedi and Mr. Younger, appointed the latter to proceed with the defense after a continuance of one week to enable preparation. At the conclusion of that week (on December 28), Mr. Younger appeared with Crovedi pursuant to the court's order of appointment. He then indicated to the court that he was inadequately prepared to proceed with the trial, and again he registered a vigorous protest against his appointment. Crovedi at this time stated that he had made diligent efforts to retain an attorney of his choice since he had learned, at the December 21 hearing, that the court intended to appoint Mr. Younger. He further stated that the attorney with whom he had consulted during that week had represented that a minimum of four weeks would be required to prepare the case properly. The court at this time declined to grant an additional continuance, and the trial was resumed with Mr. Younger acting, over his own and defendant's protest, as Crovedi's counsel.

---

[1] Of the fifty-one witnesses called by the prosecution, seven did not reside within the Southern California area. Of these seven, five were examined and excused during the four days of trial prior to Mr. Chain's illness. The two remaining witnesses were agents of the Federal Bureau of Investigation. Robert Baker, a special agent with the Chicago office of the bureau, testified in the prosecution's case-in-chief prior to Mr. Chain's illness, but he was recalled as a rebuttal witness after Mr. Younger had been appointed to replace Mr. Chain. James Bruder, a fingerprint examiner with the Washington office of the bureau, testified during the prosecution's case-in-chief subsequent to Mr. Younger's appointment.

The completion of the trial required three calendar weeks (13 trial days), the verdict being rendered on January 14, 1965. On January 19 defendant Crovedi noticed a motion for new trial, and he filed in support thereof points and authorities urging that the court prejudicially abused its discretion in denying the motion to grant a continuance sufficient to allow his representation by retained counsel of his choosing, that he was denied counsel of his own choice in violation of his constitutional rights, and that appointed counsel was not allowed adequate time for preparation. Also filed in support of the motion was the affidavit of Mr. Younger, which set forth in substance what has been above related concerning the circumstances of his appointment as Crovedi's attorney.[2] Mr. Leddy submitted an affidavit in opposition,[3] and the matter came on for hearing on February 5. The court ruled in relevant part as follows: ''Now, so far as my ordering you, Mr. Younger, to proceed with this matter after Chain's unfortunate illness was concerned, it is the Court's opinion that in spite of your statements belittling yourself on your ability that you performed admirably in the case, did a very good job with what tools you had to work with and made a very adequate presentation of the matter to the jury. I feel Mr. Crovedi's constitutional rights were not violated in any respect by your appointment. I feel that I did not abuse my discretion that I feel I have in making that appointment. I also feel that you had more than adequate time to prepare the matter and, in fact, did a very excellent job of presentation. For all of these reasons the motion for a new trial will be denied.''

[2]In addition to and in elaboration of the matters above related, the affidavit of Mr. Younger stated the following: ''That except for his appearance in the trial of this matter, affiant has never conducted or participated in the conduct of a criminal defense before a jury in Superior Court. That at the time of his appointing the Court and opposing counsel were well aware of affiant's lack of experience in this regard. That affiant was unacquainted with the criminal law and procedure applicable to the instant case and, in particular, was unacquainted with the law of conspiracy, arrest and search, and seizure, and with the various important rulings which had been made by the Court pertaining to these matters during the first week of the trial. . . .'' That affiant ''conferred with the defendant Crovedi for the first time on Sat. afternoon December 26th. That during said conference strong differences arose between affiant and the said defendant both as to the strategy and procedure to be used in trying the case and whether the said defendant would follow affiant's instructions. That the said differences persisted thereafter throughout the trial of this matter.''

[3]Mr. Leddy's affidavit stated, among other things, that the court, in its December 7 meeting with Mr. Younger, advised him ''that he might be required to step in to the trial,'' and that ''the Court further advised the jury [later that day in open court] that it was anticipated that we would further continue with the case on the 21st day of December, 1964.''

Defendant's general contention, that he was denied his constitutional right to the assistance of counsel, would seem to include within it two more specific contentions. The first is that the trial court's refusal to grant a continuance, whether for the purpose of allowing defendant to be represented by counsel of his own choice or for the purpose of allowing appointed counsel adequate time for preparation, deprived him of a fair trial. The second is that due process of law comprehends a right to appear and defend with counsel of one's own choice, and that this right was violated by the trial court's action herein *regardless* of whether a fair trial resulted. Our conclusion as to the second of these contentions renders moot a consideration of the first.

The primary value expressed by the concept of procedural due process, as reflected in specific applications, is that seeking to minimize the possibility that an innocent man will be punished. It is clear, however, that the due process concept does not begin and end with this concern that our processes for the determination of guilt be reliable or "fair," for many applications manifest the additional concern that the individual against whom these processes operate be accorded treatment consistent with human dignity. (See Kadish, *Methodology and Criteria in Due Process Adjudication*, 66 Yale L.J. 319, 346-347.)

The decision of the United States Supreme Court in *Chandler* v. *Fretag*, 348 U.S. 3 [75 S.Ct. 1, 99 L.Ed. 4], demonstrates the vigor of this additional concern in the right-to-counsel area. There a defendant in a state court had waived counsel relative to a charge of housebreaking and larceny, but when he was advised by the court that he would also be tried as an habitual criminal because of prior convictions, he requested a continuance to enable him to retain counsel to represent him relative to the habitual criminal accusation. This request was denied, and defendant was tried and found guilty of habitual criminality. The Supreme Court reversed, holding *inter alia* that the issue whether defendant had received a fair trial absent counsel, according to the doctrine of *Betts* v. *Brady*, 316 U.S. 455 [62 S.Ct. 1252, 86 L.Ed. 1595], was not relevant in the premises. "But that doctrine has no application here. Petitioner did not ask the trial judge to furnish him counsel; rather, he asked for a continuance so that he could obtain his own. The distinction is well established in this Court's decisions. *Powell* v. *Alabama*, 287 U.S. 45, 71 [53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527]; *Betts* v. *Brady*, 316 U.S. 455, 466,

468 [62 S.Ct. 1252, 86 L.Ed. 1595]; *House* v. *Mayo*, 324 U.S. 42, 46 [65 S.Ct. 517, 89 L.Ed. 739]. Regardless of whether petitioner would have been entitled to the appointment of counsel, his right to be heard through his own counsel was unqualified. . . . By denying petitioner any opportunity whatever to obtain counsel [of his own choice] on the habitual criminal accusation, the trial court deprived him of due process of law as guaranteed by the Fourteenth Amendment.'' (*Chandler* v. *Fretag, supra,* 348 U.S. 3, 9-10.) ■ The import of this decision is clear: the right to employ one's own counsel is based on a value additional to that insuring reliability of the guilt-determining process. Here we are concerned not only with the state's duty to insure ''fairness'' in the trial, but also with the state's duty to refrain from unreasonable interference with the individual's desire to defend himself in whatever manner he deems best, using every legitimate resource at his command. (See Israel, *Gideon* v. *Wainwright: The Art of Overruling,* 1963 Sup. Ct. Rev. 211, 243-244.) This reading of the *Chandler* case is emphasized in the later case of *Reynolds* v. *Cochran,* 365 U.S. 525, at page 531 [81 S.Ct. 723, 5 L.Ed.2d 754], where the following observation occurs: ''It is significant that in *Chandler* we did not require any showing that the defendant there would have derived any particular benefit from the assistance of counsel.''

■ That the concept of procedural due process, as it relates to the right of counsel, manifests a value seeking to insure respect for the dignity of the individual does not, of course, demand the result that due process is denied any defendant who is refused the right to defend himself by means of his chosen retained counsel. The reason is that other values of substantial importance, for instance that seeking to insure speedy determination of criminal charges, demand recognition. (See *United States* v. *Mitchell,* 354 F.2d 767, 769.) The very development of Anglo-American procedures associated with the concept of due process exemplifies the accommodation of seemingly conflicting values within the context of enforcing the criminal law (see Kadish, *supra,* at p. 349), and it is only ''by the gradual process of judicial inclusion and exclusion'' (*Davidson* v. *New Orleans,* 96 U.S. 97, 104 [24 L.Ed. 616]) that such an accommodation proceeds. The words of Mr. Justice White in *Ungar* v. *Sarafite,* 376 U.S. 575, at page 589 [84 S.Ct. 841, 11 L.Ed.2d 921], are peculiarly relevant in this regard: ''The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if a party

fails to offer evidence or is compelled to defend without counsel. *Avery* v. *Alabama,* 308 U.S. 444 [60 S.Ct. 321, 84 L.Ed. 377]. Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. *Chandler* v. *Fretag,* 348 U.S. 3 [75 S.Ct. 1, 99 L.Ed. 4]. There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.''

California decisions in this area reflect a determination that respect for the dignity of the individual shall be maintained within the context of enforcing the criminal law, and that a reasonable accommodation of seemingly conflicting values shall thereby be achieved. Thus, though it is clear that a defendant has no *absolute* right to be represented by a particular attorney,[4] still the courts should make all reasonable efforts to ensure that a defendant financially able to retain an attorney of his own choosing can be represented by that attorney. (See *People* v. *Logan,* 4 Cal. 188.) This is especially so when defendant is in no way responsible for the absence of his retained counsel. (*People* v. *Manchetti,* 29 Cal.2d 452, 458 [175 P.2d 533].) Likewise, in cases involving the representation of multiple defendants by a single attorney, an accused must be afforded reasonable opportunity for representation by retained counsel of his own choice whether or not a conflict of interest is shown. ''[A] diversity of interest in the sense of any factual inconsistency between the defenses advanced is not the sole or necessarily the controlling consideration underlying the requirement that counsel for a codefendant not be forced upon another defendant. It is not necessary for [the defendant seeking independent representation] to show that he had some diversity of interest from [his codefendant] . . . ; entirely apart from any factually apparent diversity of interests [the defendant is] entitled to the undivided loyalty and untrammeled assistance of his own counsel.'' (*People* v. *Robinson,* 42 Cal.2d 741, 747-748 [269 P.2d 6]; see also *People* v. *Douglas,* 61 Cal.2d 430, 438 [38 Cal.Rptr. 884, 392 P.2d 964].) Finally, the same concern is manifested in cases where the defendant

---

[4]''It is manifest that the courts cannot in every case await the convenience of some attorney before they can function. Reduced to its lowest terms this would allow a popular attorney to have the courts marking time to serve his convenience.'' (*People* v. *Dowell,* 204 Cal. 109, 113 [266 P. 807].)

has made a mature decision to the effect that he shall defend himself without counsel. Thus, except in specified situations wherein the Legislature has determined that counsel is essential,[5] the court cannot force a competent defendant to be represented by an attorney. (*People* v. *Mattson*, 51 Cal.2d 777, 788 [336 P.2d 937] ; see also *Adams* v. *United States*, 317 U.S. 269, 279 [63 S.Ct. 236, 87 L.Ed. 268, 143 A.L.R. 435].) .

All of the foregoing cases demonstrate a conviction that the state should keep to a necessary minimum its interference with the individual's desire to defend himself in whatever manner he deems best, using any legitimate means within his resources—and that that desire can constitutionally be forced to yield only when it will result in significant prejudice to the defendant himself or in a disruption of the orderly processes of justice unreasonable under the circumstances of the particular case.

We are convinced that the circumstances of this case did not justify the trial court's refusal to permit defendant to be represented by counsel of his own choice, and that therefore that refusal constituted a denial of due process of law. We are not here concerned with a defendant whose actions imply a disposition to abuse the patience of the court through dilatory efforts to seek counsel. (Compare *Ungar* v. *Sarafite, supra,* 376 U.S. 575 with *In re Masching,* 41 Cal.2d 530. [261 P.2d 251], and *People* v. *Robinson, supra,* 42 Cal.2d 741.) On the contrary, it appears that defendant's efforts to retain experienced counsel of his choice during the week intervening between Mr. Younger's forced appointment and the commencement of trial were diligent, and that the failure of those efforts was due solely to the court's refusal to grant the continuance considered necessary for effective representation by such counsel. (Compare *People* v. *Simpson,* 31 Cal.App.2d 267 [88 P.2d 175].) Nor can it be said that the alternatives presented to the trial court in order to allow defendant's representation by counsel of his choice were in any way unreasonable. The trial of Crovedi's codefendant Harris had been continued due to illness of his attorney until February 23, or eight weeks subsequent to the eventual resumption of the Crovedi trial. At that time, according to the opinion of Mr.

[5]Penal Code, § 859a (defendant not represented by counsel cannot plead guilty before the magistrate) ; § 860 (only ''a defendant represented by counsel'' can waive his right to a preliminary examination before the magistrate) ; § 1018 (court cannot receive plea of guilty to crime for which maximum punishment is death or life imprisonment without possibility of parole unless defendant is represented by counsel).

Chain's physician, defendant's retained counsel would have been fully able to continue his representation.[6] Further, codefendant Riccio's announced willingness to join in a motion for continuance would have made possible a joint trial of all defendants at that time. ■ The court's concern as to the convenience of out-of-state witnesses was apparently unjustified (see fn. 1, *supra*). In the event that a continuance had been granted, it appears that only two out-of-state witnesses, both agents of the Federal Bureau of Investigation, would have been required to alter their schedules in order to be available to give testimony at a later date. In the event that a mistrial had been declared and the trial recommenced on February 23, the testimony of out-of-state witnesses received prior to Mr. Chain's illness could very well have been readmitted by stipulation.

The foregoing remarks do not constitute an exercise of hindsight. All of the facts were before the court, or were readily available to it through consultation with the prosecutor, when it ruled upon the motion for continuance and/or mistrial prior to the resumption of the trial. We do not demand prescience of trial courts faced with decisions involving the right of representation by counsel—but we must require of them a resourceful diligence directed toward the protection of that right to the fullest extent consistent with effective judicial administration.

Our holding herein renders unnecessary a consideration of defendant's additional contention relative to allegedly prejudicial publicity prior to and during the trial. It is presumed that upon retrial the court will be adequately guided in this regard by the standards recently set forth by the United States Supreme Court in *Sheppard* v. *Maxwell,* 384 U.S. 333 [86 S.Ct. 1507, 16 L.Ed.2d 600].

The judgment is reversed.

Traynor, C. J., Peters, J., Tobriner, J., Mosk, J., and Burke, J., concurred.

## APPENDIX

At the commencement of the December 21 proceedings, Mr. Younger emphasized that he represented neither defendant nor Mr. Chain, and that his appearance was made "solely as a courtesy to the Court" so that he could present requested

---

[6]In his points and authorities in support of the motion for new trial, filed on February 2, 1965, Mr. Chain states that he had at the time of said filing returned to his practice and "would have been available had the continuance been granted."

information regarding Mr. Chain's physical condition. The medical report was presented, indicating the opinion that Mr. Chain would be fit to return to courtroom work in mid-February, and then Mr. Younger, "solely by way of communication to the Court what [defendant's] desires are," indicated defendant's wish that the case be continued until he should be able to appear with his retained counsel. The court replied that it considered a continuance "as late as February . . . unreasonable under the circumstances," observing that the desired continuance would require that the jury be recessed for a month and a half, during which time it would have to retain the four days of testimony heard prior to Mr. Chain's incapacity. Mr. Younger here noted that the jury's recollection of prior testimony could be refreshed when the trial resumed through a reading of the partial transcript, and he further observed that any problem of former jeopardy could be effectively avoided through specific waiver of that defense on the part of defendant.

At this point the prosecutor, Mr. Leddy, addressed the court to the effect that substitutions and other difficulties as to the presence of counsel had caused prior delay and inconvenience; that the court had no process to compel the attendance of certain "witnesses from Chicago . . . [who had] come here voluntarily . . . [though] reluctantly"; that the bulk of these witnesses, "and I would say probably all of them," would not be needed in the trial of Lester Harris; that defendant would not be prejudiced by being required to proceed without his chosen counsel because the primary defense, as indicated by Mr. Chain's opening statement, was to be duress, a matter which was "only going to depend on the appearance of the defendant since the only person who can contest duress per se is the person who asserted that duress, and that person [Mendolia] is dead"; and that for these reasons Mr. Younger should be substituted for Mr. Chain and the trial proceed after a short continuance to allow for the preparation necessary to present the contemplated defense in an adequate manner.

Mr. Younger then addressed the court as follows:

"The remarks by Mr. Leddy are, failed to point out any prejudice at all that could really result to him if the continuance is granted. His witnesses don't have to come back. The case will be continued for Mr. Riccio as well as Mr. Crovedi [Defendant Riccio earlier in the hearing had stated through counsel that he had 'no objection to the continuance' and that he would be willing, 'as far as the subsequent ele-

ments are concerned, to waive time for the continuance if the court saw fit to grant the same'], so that argument doesn't have any meaning at all, and as far as the delay in the processes of justice, I fail to see how it makes a great deal of difference whether this trial proceeds eleven months after the alleged commission of the offense or thirteen months after the alleged commission of the offense. . . .

''The cases Mr. Leddy cites are not in point. The civil case he cites to the effect a partner could be substituted, a fantastic comparison. This is a very important criminal case in which I was not a partner when Mr. Chain was retained and which I have never even had an opportunity to speak to Mr. Crovedi. Sure, I have a telephone, but who could imagine I could prepare a case in a telephone conversation with Mr. Crovedi.

''As a matter of fact, as I can recall it now, I have had three conversations with Mr. Crovedi in my life. One at the time I found out about, that Mr. Chain was ill, and one right after I appeared in Court, and one this morning. I have never talked about the nuances or circumstances of the case at all, and I have participated in not one whit in the preparation of the case. I am totally unfamiliar with the very important rulings in respect to evidence and totally unfamiliar with the strategy of the defense that Mr. Chain has planned. . . .

''As far as the transcript is concerned, I haven't seen it yet, and even if an attorney would step in at this juncture and it were not malpractice, or close to it, he would have to have several weeks, I'm sure, to review the transcript and confer with Mr. Crovedi. After all, Mr. Leddy has seen fit to have several months to prepare the case. I understand he took two and a half to three months before, after the commission of the offense, before he collected enough evidence to decide to take it before the Grand Jury. He's had six or seven months since that date preparing it. It's asking the impossible to ask defense counsel to step in in any less time. So even if the Court had the idea of attempting to force other counsel to step in at this juncture I think the Court would be faced with the proposition with allowing that counsel a reasonable time, and I think reasonable time is approximately the amount of time that is requested here, six or seven weeks. At that time Mr. Crovedi's own counsel, Mr. Chain, and who has been with him throughout the case, is a leading defense counsel in this part of the world, will be able to step in. . . .''

Hereupon the court said that it was not disposed to grant a continuance for the amount of time requested, though it would

grant "a reasonable continuance" to enable substituted counsel to prepare, and that during the proceedings of December 7, when Mr. Younger first appeared to advise the court of Mr. Chain's illness, a two-week continuance was granted "to permit not only definite ascertainment of Mr. Chain's condition but proper arrangements to proceed to trial at this time, provided that Mr. Chain would not be able to do so." Mr. Younger then stated that he had not received that understanding from the December 7 proceedings, and that the first notice he had received of the court's intention that he proceed with the Crovedi defense was through Mr. Leddy on December 18.

At this point the court asked defendant's wishes in the matter, and the following colloquy ensued:

"THE COURT: Mr. Crovedi, stand up, please. Do you desire to have Mr. Younger take over the defense of your case?

"A. Your Honor, I paid Mr. Chain to defend me. I want Mr. Chain to defend me.

"THE COURT: Well, Mr. Chain is ill and is unable.

"A. I have to discuss it with him. This is the first I have heard of it.

"THE COURT: I'll give you ten minutes to discuss it with him.

"(Discussion between Mr. Crovedi and Mr. Younger)

"MR. CROVEDI: Your Honor, I feel that I want Mr. Chain.

"THE COURT: Well, Mr. Crovedi, I would be quite happy to have Mr. Chain represent you if he were physically able.

"MR. CROVEDI: That's the way I feel about it. . . .

"THE COURT: Well, Mr. Crovedi has announced that he desires Mr. Chain. I will appoint Mr. Younger to represent Mr. Crovedi in the continuance of this matter being a partner of Mr. Chain and having the facilities of Mr. Chain's office and having the facilities of his investigative staff, having all of the information at the hands of Mr. Chain at the time of the occurrence of the unfortunate illness of Mr. Chain, and if you desire it, Mr. Younger, I will give you a few days time to familiarize yourself with this transcript.

"MR. YOUNGER: Your Honor, I recognize the ethical duty of an attorney to accept an appointment, and I don't consider that a minor matter. On the other hand, Mr. Crovedi has expressed in no uncertain terms that he does not desire me to represent him. Moreover, the Court well knows that there is no conceivable way that I could be adequately prepared to do a reasonable job for the defense of Mr. Crovedi in the kind of time that you are talking about, and, frankly, I don't believe

that you would expect any other trial attorney, me or anybody else to step in and do an adequate job. On the basis of that, your Honor, why, I would have to decline the appointment. There is no way I can work with a man who doesn't want me to act as his counsel, and there is no way I could adequately proceed with the defense on his behalf and provide competent counsel, and the Court well knows that.

"The Court: Mr. Younger, on the contrary, the Court has tried very many cases in less time to prepare them with much greater complexity on far less time than I am willing to grant you; so I will not accept your declination. You are appointed to represent Mr. Crovedi in the further continuance of this case as a partner of Mr. Chain.

"Now, do you want some time; if so, express yourself on how much.

"Mr. Younger: Your Honor, I know of no law that says that it is possible for an attorney to step in and represent a man when a man doesn't want him to represent him.

"The Court: Mr. Younger, you will stand up, please, when you address the court. I don't care if you know of any such law or not, that will be the order of this Court. Now, how much time do you desire?"

"Mr. Younger: I think that the only reasonable amount of time that the Court can consider in something like this would be the approximate amount of time that, I believe, Mr. Chain spent. I believe Mr. Chain spent about six to eight weeks for preparation.

"The Court: All right. What is your opinion as to the amount of time, Mr. Leddy? . . .

"Mr. Leddy: Your Honor, I think I mentioned before this transcript can be read in about six hours. I think that the defense counsel in his opening statement conceded most of the material facts. I think that, I don't know the number of defense witnesses, but I'm sure that they could all be interviewed in a short space of time. The defense is duress. The only witness, I would gather from that defense, would be the witness who heard Mr. Mendolia allegedly threaten to take the life of Mr. Crovedi. That cannot be a large number of witnesses. I don't think that any longer than a week would be necessary. Certainly, probably even less. By that time—Christmas is Friday, I would say certainly not longer than a week.

"Mr. Younger: Your Honor, it might not be unreasonable for me to discuss the matter with Mr. Chain, if he's able to talk in the hospital, and I see no reason why the Court

shouldn't allow that before proceeding with whatever it has in mind, either as far as an appointment or trial date.

"THE COURT: No, I have already appointed you, Mr. Younger. I'll continue this until—when is the next trial date next week?

"CLERK: December 28th.

"THE COURT: Continue this matter until the 28th day of December at the hour of 9:30 A. M.

"MR. YOUNGER: Your Honor, I do desire to say one or two additional things. . . .

"THE COURT: You may do so, Mr. Younger.

"MR. YOUNGER: . . . The Court is aware of the fact that because of Mr. Chain's illness I am the only attorney in the office. It is one of the busiest practices in Kern County. I have many other matters that are scheduled, many of them are criminal cases, just as this one is. A number of them are important civil cases. I believe I even discussed one of those briefly with the Court. All of these matters, just to delay and continue them is going to require a good deal of effort and time on my part. In addition to the fact that I am now alone in the office, the press of business that grew while Mr. Chain was engaged in the trial of this case has made it even more difficult and piled up even more matters. Frankly, your Honor, I see no conceivable way how I can get through that transcript, familiarize myself with the contents of the transcript, familiarize myself with the evidentiary matters. I understand that they have been very substantial, especially the very important rulings to suppress evidence within one week. The Court, I believe, should take this into consideration. In any event, I want the record to indicate that I believe the amount of time granted by the Court is not sufficient for me or anybody else to step in. Especially, it isn't sufficient because of some of these matters that I have just made reference to with respect to the business in the office.

"The court is almost asking the office to get out of the practice of law, and I think this is asking not only a good deal of Mr. Crovedi, that is, asking him to accept an attorney who is ill prepared and unable to provide effective counsel but asking a good deal of the law firm. I can't believe that an appellate court—

"THE COURT: Well, Mr. Younger, you will have your opportunity to present those matters to any appellate court if we have made a ruling that is an abuse of discretion. It is the opinion of the court, however, your individual problems are

secondary to your obligation to practice law for your client, when you accept them you put yourself out on their behalf and this includes those who are charged with crimes as well as those who are engaged in civil activity, and I am satisfied that you will be able to work your office around and prepare this case as adequately as I know you are quite capable of doing."

The court hereupon recessed for one week. On December 28, Mr. Younger appeared with defendant. The following proceedings occurred at that time out of the presence of the jury:

"MR. YOUNGER: Your Honor, I am here pursuant to your order, and not to be here would place me in the position of being in contempt. However, I believe that the interests of my clients and, frankly, my own interests require that I indicate for the record certain additional factors that have become apparent to me the past few days. First place, I spent all of Christmas Day at the office reading the 600 odd pages of transcript. I have gotten through the transcript and I haven't had an opportunity to read the Grand Jury transcript and haven't had an opportunity to look at the fifty or sixty exhibits. I haven't had an opportunity to adequately familiarize myself with the rather complicated law of search and seizure, which seems to be playing such an important part in this case. I have had only one opportunity to talk to my client and that has been on this last weekend, Saturday and Sunday, and I worked this last weekend, also. Part of the reason for this is because of the fact, as the Court knows, I am the only attorney in the office, and the matters that I had Monday, Tuesday, and Wednesday after the Court ordered me to act in this case were such that I just couldn't disregard the interests of the clients and the interests of other counsel and courts and devote all my time just to this case.

"In talking to Mr. Crovedi this weekend it has become quite clear that he resents the fact that I have been forced upon him, and I can't say I blame him. In fact, I understand that he has contacted other counsel in Los Angeles, counsel who is experienced in the trial of criminal matters, however, that he has been informed that such counsel could not agree to act for him unless he were given at least four weeks preparation time to appear. The Court can best, I think, ascertain these matters from Mr. Crovedi, and I suggest that the Court do that. It is my understanding that the name of the law office that Mr. Crovedi contacted was that of Grant Cooper in Los Angeles.

"THE COURT: Do you have anything to say in that respect, Mr. Crovedi?

"MR. CROVEDI: Your Honor, I did call Mr. Cooper's office. Mr. Cooper wasn't in town. He won't be back until the 4th of January. When he comes back he has a very pressing matter in Washington, but he did refer me, I should say, to an associate of his, Mr. Richard Moore. I did talk to Mr. Moore. Mr. Moore informed me when I explained the situation here, informed me that he didn't think there was any way possible that an attorney, or—I'm trying to think of the right word to use—I can't remember it. What he meant was he didn't think there was any way possible an attorney could prepare himself in a week, especially after it had been in trial for a week, that there have been a number of exhibits introduced. I told him the transcript was probably 500 or—I just heard it was 600 today.

"THE COURT: 518 pages.

"MR. CROVEDI: I told him I thought it was a 500 page transcript, that there is a Grand Jury transcript of about 200 pages. He said, 'I don't see how I can do it in that length of time.' He said, 'Now, I will make an appointment for you to come and see me Tuesday. . .'—which will be tomorrow morning at 10:00—'If you can get the Court's permission, come in and see me and give me enough time. I will need at least four weeks.' That is the way it stands, your Honor. As you know I wished for a continuance so I could keep Mr. Chain. I believe Mr. Chain is very capable. The Court doesn't see fit to do that, I suppose.

"THE COURT: Have you any comments, Mr. Leddy?

"MR. LEDDY: Only, your Honor, of course I think the record should indicate—I had a portion of that reread—

"THE COURT: I think it would be well if you stood up before the Court.

"MR. LEDDY: I reread a portion of the transcript, and I think that the record should indicate that the Court did mention the possibility of appointing Mr. Younger on the 7th of December, and of course Mr. Chain's condition has now been apparent, I would say, for three weeks, certainly more, 23 days; so we have a situation where I think everybody knew, everybody was saying, your Honor, that Mr. Chain had a serious heart condition or was hospitalized, virtually incommunicado except for being able to see his wife, three weeks ago, and now we find that apparently some time last week Mr. Crovedi has made a phone call to an attorney who is not in his office and his associate says he would not be able to prepare for him. He has no, apparently made no other attempts in the last three

weeks, nor made any attempt to make a firm arrangement with anyone.

"MR. CROVEDI: May I say something, your Honor?

"THE COURT: If you desire to.

"MR. CROVEDI: I didn't know until last week that Mr. Younger was going to be ordered to appear for me.

"THE COURT: Well, there seems to be some confusion. The Court was definitely of the opinion that at the time of the original continuance for two weeks I advised Mr. Younger, and I anticipated that he would be able to proceed to trial on last Monday. Mr. Younger didn't recall that in the transcript, but I looked at it and I found it to be there, so I presume it is one of those things that you comment in passing and it is forgotten and not heard under the stress and strain of the moment. In any event, in effect, Mr. Younger has been in this case for now some three weeks, and although forcefully appointed, I might say, only one week ago, and I have personally read this transcript, and I found no particular problem in disposing of 500 plus pages of the transcript in a reasonable length of time, and so I appreciate that Mr. Younger may not have devoted as much time as he might have if he had nothing else to do, I cannot help but feel he is like any other attorney, gets his work out for all of his clients and does an effective job, although he is usually belittling himself because he knows he could have spent more time at it. Taking that into consideration, also taking into consideration that he has the facilities of all the prior preparation of Mr. Chain, the assistance of Mr. Winters and Mr. Noriega [investigators] of his office, I can't help but feel that he had had adequate time, and if this is a purported motion for additional continuance, which I have not heard, but if it is so construed, I will deny it. . . ."

McCOMB, J.—I dissent. I would affirm the judgment for the reasons expressed by Mr. Justice Ralph M. Brown in the opinion prepared by him for the District Court of Appeal in *People v. Crovedi* (Cal.App.) 49 Cal.Rptr. 724.