Filed 7/14/14  In re G.M. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re G.M., et al., Persons Coming Under the Juvenile Court Law. | D065186 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>CARRIE M., et al.,<br><br>        Defendants and Appellants. | (Super. Ct. No. J517158) |

APPEAL from orders of the Superior Court of San Diego County, Garry G. Haehnle, Judge.  Affirmed.

Neil R. Trop, under appointment by the Court of Appeal, for Defendant and Appellant Carrie M.

Katherine A. Clark, under appointment by the Court of Appeal, for Defendant and Appellant M.M.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel and Paula J. Roach, Deputy County Counsel, for Real Party in Interest San Diego County Health and Human Services Agency.

Maria Diaz, under appointment by the Court of Appeal, for Minors.

Carrie M. and M.M. appeal a juvenile court order terminating their parental rights to their minor children, P.M., G.M. and S.M.  Both contend the beneficial parent-child relationship exception to adoption applied and the court should have selected a permanent plan of guardianship or long-term foster care.  Carrie also contends the court did not obtain a knowing and intelligent waiver of her right to counsel, erred by denying her request for a continuance of the Welfare and Institutions Code[1] section 366.26 hearing, and the juvenile court's cumulative errors require reversal.  We affirm the orders.

## FACTUAL AND PROCEDURAL HISTORY

This dependency proceeding began in December 2010 when G.M. tested positive for high levels of methamphetamine at birth.  Carrie, an addict, initially denied using methamphetamine but shortly afterward admitted relapsing while she was pregnant.  When G.M. was born, Carrie and M.M. were also caring for their 11-month-old daughter, P.M., and Carrie's 14-year-old daughter, Michelle R.  Both Carrie and M.M. had lengthy

---

[1]     All further statutory references are to the Welfare and Institutions Code.

2

criminal backgrounds and prior involvement with the San Diego County Health and Human Services Agency (the Agency).[2]

Initially the Agency agreed to allow Carrie and M.M. to participate in voluntary services, including drug treatment and testing for Carrie.  Carrie, however, did not engage in the services or drug test.  As a result, the following month the Agency filed a petition with the juvenile court under section 300, subdivision (b), on behalf of G.M., alleging he suffered or was at substantial risk of harm by the failure or inability of his parents to provide him with adequate care because of Carrie's substance abuse.  At the detention hearing, the court appointed counsel for both parents.  At the jurisdiction hearing in March 2011 the court declared G.M. a dependent of the court, ordered him placed with M.M. and that services be provided to both parents.  The court ordered supervised visits for Carrie.  Around the same time, Carrie was sentenced to one year in custody for violating parole by using methamphetamine and M.M. lost his job.

In June 2011 Carrie was released from prison and paroled for one year.  She was also ordered to attend outpatient treatment and Narcotics Anonymous meetings.  For the six-month review hearing in September, the Agency reported Carried had not engaged in the required outpatient treatment, and had missed a drug test and an appointment with the

---

2      Carrie has a total of seven children.  Two older boys, ages 16 and seven at the start of this proceeding, were in the custody of Carrie's mother, and another son, age nine, was in the custody of his paternal grandfather.  An 11-year-old daughter was in a paid only guardianship with the Agency.  M.M. also has another daughter who was a dependent of the juvenile court, but reunified with her mother.  M.M. did not participate in reunification services with the daughter because he was incarcerated during her dependency.

Agency's social worker. An arrest warrant was also issued for Carrie after she did not contact her parole agent. The Agency reported G.M. was doing well in M.M.'s care but that M.M. had not yet found a job or stable housing. At the hearing, the court adopted the Agency's recommendation that services be continued and that G.M. remain in M.M.'s care.

By the 12-month review hearing M.M.'s living situation had still not stabilized. He was moving between friends' homes, had found a job but was fired, and frequently left P.M. and G.M. with others. M.M., who also had a history of substance abuse, was in and out of touch with the Agency and did not drug test on two occasions. Carrie was arrested again in February 2012 and was expected to be released in April. She had not engaged in drug treatment or therapy. She was also pregnant and due to give birth in late March. The Agency recommended continued services for M.M., but not for Carrie.

On April 9, 2012, shortly after Carrie gave birth to S.M., the Agency determined the children were no longer safe in M.M.'s care and filed a section 387 petition on behalf of G.M. and section 300 petitions on behalf of P.M. and S.M. The petitions alleged M.M. and Carrie had not complied with their case plan, did not have stable housing, and M.M. had not kept the Agency informed of G.M.'s and P.M.'s whereabouts. At the detention hearing the court ordered all three minors detained at Polinsky Children's Center. At the jurisdiction and disposition hearing on May 1, 2012, M.M. requested trial. The same day the Agency held a team decision meeting with Carrie and M.M. to discuss the minors' placement, but the parents angrily walked out, stating their input was not valued by the Agency. At a settlement conference on June 4, 2012, Carrie requested that a new

4

attorney be appointed to represent her.  The court held a *Marsden*[3] hearing and denied Carrie's request.

At the conclusion of the jurisdiction and disposition trial on June 29, 2012, the court found the allegations in the Agency's petitions to be true, declared G.M., P.M. and S.M. dependents of the juvenile court, and placed all three minors in licensed foster homes.  P.M. and G.M. were placed together and S.M. was placed in a separate foster home.[4]  The juvenile court also ordered the Agency to provide additional reunification services to Carrie and M.M.

By the next review hearing in December 2012, M.M. had not yet found stable employment.  He had completed anger management and parenting classes, and started therapy.  Both parents completed the Incredible Families Program, which included visitation and parenting classes.  Carrie continued to struggle with her case plan.  She tested positive for methamphetamine in October and did not drug test on several other occasions.  Carrie had not entered into a treatment program, but her counsel told the juvenile court she was slated to begin a program and had recently located a therapist. The Agency reported both parents' visits with the three minors during the review period were generally positive.  At the conclusion of the hearing the court continued reunification services for both parents.

---

3  *People v. Marsden* (1970) 2 Cal.3d 118.

4  Carrie and M.M. filed notices of appeal of the juvenile court's order.  Counsel submitted a brief asking this court to exercise its discretion to review the record for error under *In re Sade C.* (1996) 13 Cal.4th 952; the request was denied.

5

Shortly after that review hearing, Carrie was arrested and incarcerated on charges of second degree burglary. M.M. was cited at the same time for driving a vehicle with stolen tags. Thereafter, M.M. was arrested three times and, by the time of the review hearing in June 2013, was incarcerated and facing a lengthy criminal sentence. Carrie was also arrested again in April 2013 for obstructing police after she attempted to warn M.M., who had a warrant out for his arrest and was hiding in a locked bedroom with a pit bull, that police were at the door.

In addition to the parents' criminal activity, the review period was marked by Carrie's sporadic participation in services, missed visits with the minors and missed drug tests. As during the previous review period, visits between the minors and Carrie were generally positive. The minors were also brought to M.M.'s detention facility for visits on a regular basis, and those visits were also generally positive. In its report for the next review hearing, however, the Agency recommended services be terminated and the juvenile court set a section 366.26 selection and implementation hearing. At the conclusion of the contested review hearing in July 2013, the juvenile court agreed with the Agency's recommendations, finding it unlikely the minors could be returned to Carrie or M.M.[5] The court terminated services for both parents and set a section 366.26 hearing for November 13, 2013.[6]

---

5    By this time, S.M. had transitioned into the home of her sibling's foster mother, who was interested in adopting all three children.

6    Both parents filed notices of intent to seek writ review, but their counsel later notified this court there were no viable issues and the case was dismissed.

6

By the section 366.26 hearing on November 13, 2013, M.M. had been sentenced and was not expected to be released from prison until July 2015. At the hearing, Carrie again requested new counsel. The court conducted another *Marsden* hearing and denied Carrie's request. In response Carrie requested to terminate her counsel. The court granted this request and allowed Carrie to represent herself. Both parents contested the termination of their parental rights and the court set the matter for trial on December 9, 2013.

At the outset of the Monday trial, Carrie requested a continuance to provide her additional time to review the Agency's delivered service logs, which she received the previous Friday. The court responded the trial would go forward with some of the evidence and Carrie could renew her request for additional time to review the logs later if needed. Before the lunch recess the court asked Carrie if she would like additional time during lunch to review the logs before proceeding with examination of the Agency's social worker; Carrie responded that was fair. After the recess, the court asked Carrie if she had enough time to review the logs. Carried responded affirmatively and stated she was ready to proceed.

The evidence at trial consisted of the Agency's reports, M.M.'s written statement, and the testimony of the minors' foster mother and current social worker. Carrie examined both witnesses. The foster mother testified she was willing to adopt all three minors and continue with behavioral therapy for P.M. and G.M. The social worker testified all three minors were generally and specifically adoptable and, in addition to the foster mother, there were 49 families in San Diego interested in adopting a sibling set

7

with the characteristics of P.M., G.M. and S.M. The social worker also stated that, based on her supervision of a visit and review of the Agency's logs and reports, Carrie and M.M. did not have strong parent-child relationships with any of the minors. She also stated the detriment the minors would suffer if parental rights were terminated was outweighed by the benefits of adoption.

In closing, Carrie admitted she was in "no position to stably accept three children into [her] home" but argued for guardianship or long-term foster care rather than termination of her parental rights so she could have an opportunity in the future to regain custody. M.M.'s counsel also sought a lesser permanent plan than termination of parental rights, contending M.M. had shown the applicability of the parent-child relationship exception to adoption.

At the conclusion of trial the court commented that Carrie had done an effective job representing herself, both in her examination of the witnesses and her closing statement. The court found Carrie and M.M. loved the children but concluded neither Carrie nor M.M. had met their burden to show the parent-child relationship exception to the termination of parental rights was applicable. The juvenile court found the minors were generally and specifically adoptable, none of the exceptions to adoption existed, and terminated parental rights.

DISCUSSION

I

Carrie contends the juvenile court erred in granting her request to represent herself. Carrie argues that because her "emotions were substantially elevated" at the time she waived her right to counsel, that waiver was not knowing and intelligent.

A

Under section 317, subdivision (b), the juvenile court must appoint counsel for an indigent parent unless the court finds the parent has made a knowing and intelligent waiver of counsel. (*See In re A.M.* (2008) 164 Cal.App.4th 914, 923.) Parents have "a statutory right to self-representation in a proceeding to terminate parental rights . . . ." (*In re Angel W.* (2001) 93 Cal.App.4th 1074, 1082; *In re Brian R.* (1991) 2 Cal.App.4th 904, 921-923.) The state will only interfere with an individual's choice of legal representation, including self-representation, when that choice "will result in significant prejudice" to the individual "or in a disruption of the orderly processes of justice unreasonable under the circumstances of the particular case." (*People v. Crovedi* (1966) 65 Cal.2d 199, 208.)

Although a knowing and intelligent waiver of a parent's right to representation is required in a juvenile dependency proceeding, the court is not required to engage in the full admonition and inquiry required in a criminal case under *Faretta v. California* (1975) 422 U.S. 806. (*In re Angel W.*, *supra*, 93 Cal.App.4th at p. 1084.) Instead, whether a valid waiver of counsel was intelligently made is determined based on a review of the entire record and circumstances of the case. (*People v. Fox* (2014) 224 Cal.App.4th 424, 428.) "Further, the court must respect the right of the parent to represent him- or herself

9

as a matter of individual autonomy and avoid forcing the mentally competent parent to proceed with appointed counsel in the guise of protecting a person who is unskilled in the law and courtroom procedure." (*In re Angel W.*, *supra*, at p. 1084.)

B

Carrie contends that at the time the court granted her request to proceed without representation, she was frustrated by her counsel and her "emotions were substantially elevated." According to Carrie, because of her heightened emotional state she did not have the mental capacity to waive her right to counsel. Our review of the proceedings before, during and after Carrie's request to represent herself shows her waiver of her right to counsel was knowing and intelligent.

Carrie was appointed counsel at the outset of the case in January 2011, and she attended each hearing in the proceedings. Carrie's initial request to replace her counsel in June 2012 was denied. When the court denied Carrie's second request to replace her appointed counsel, Carrie asked to proceed without counsel. The court granted this request, stating "the Supreme Court has always said that you have a right to represent yourself, and you just need to be very careful because juvenile law is a very specialized area of law. The court is not going to give you any breaks because you are representing yourself." Carrie acknowledged the risk, responding "I know. I expected nothing less."

At the next hearing, a pretrial status conference on November 26, 2013, the court again admonished Carrie about the standard to which she would be held during trial. Carrie told the court she understood she would be held to the same standard as the attorneys. At the December 9, 2013, trial, she was prepared and ably presented her case.

10

Carrie retained a lawyer for two days to prepare for the trial. She gave an articulate opening statement, examined two witnesses, and put on a moving closing argument. In her closing, Carrie told the court she did not regret representing herself, she was proud of how she handled the case, and she felt that she did everything she could for her children. At the conclusion of the hearing, the judge praised Carrie for the manner in which she presented her case, stating he was impressed by the way she handled herself in court and the questions she asked. Based on this record, we conclude Carrie's waiver of her right to counsel was knowing and intelligent.

II

Carrie next argues the juvenile court erred by denying her request for a continuance at the start of the selection and implementation hearing on December 9, 2013. Carrie requested additional time to review the Agency's service logs, which were provided to her the Friday before the Monday hearing. After Carrie made the request, however, she agreed the hearing could proceed. The court then provided Carrie with additional time to review the logs before the hearing resumed after lunch. After lunch Carrie explicitly told the court she had enough time to review the service logs and was ready to proceed.

The record shows Carrie was provided with the time she requested to review the documents and that she acknowledged this below. Any claim of error based on her request for a continuance was, therefore, waived. (See *In re Carrie W.* (2003) 110 Cal.App.4th 746, 755 [" 'it would be inappropriate to allow a party not to object to an error of which the party is or should be aware, " ' "thereby permitting the proceedings to

11

go to a conclusion which he may acquiesce in, if favorable, and which he may avoid, if not" ' " ' "].)

## III

Lastly, Carrie and M.M. argue insufficient evidence supported the juvenile court's finding that the parent-child relationship exception to adoption did not apply. Both parents assert they maintained regular visitation and contact with the minors and had a beneficial parental relationship that outweighed the benefits of a prospective adoption. Carrie and M.M. also contend the court should have selected a permanent plan of guardianship or long-term foster care instead of terminating their parental rights.

## A

After reunification services are terminated, the focus of a dependency proceeding shifts from preserving the family to promoting the best interests of the child, including the child's interest in a stable, permanent placement that allows the caregiver to make a full emotional commitment to the child. (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534.) At the selection and implementation hearing, the court has three options: (1) terminate parental rights and order adoption as the permanent plan; (2) appoint a legal guardian for the child; or (3) order the child placed in long-term foster care. (*Ibid.*)

"Adoption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.) If the court finds a child cannot be returned to his or her parent and is likely to be adopted if parental rights are terminated, it must select adoption as the permanent plan unless it finds termination of parental rights would be detrimental to the child under one of the specified statutory exceptions.

12

(§ 366.26, subd. (c)(1)(A) & (B)(i)-(vi); *In re Erik P.* (2002) 104 Cal.App.4th 395, 401.) "The parent has the burden of establishing the existence of any circumstance that constitutes an exception to termination of parental rights." (*In re T.S.* (2009) 175 Cal.App.4th 1031, 1039.) Because a selection and implementation hearing occurs "after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

Section 366.26, subdivision (c)(1)(B)(i), provides an exception to the adoption preference if termination of parental rights would be detrimental to the child because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." Courts have interpreted the phrase " 'benefit from continuing the . . . relationship' " to refer to a parent-child relationship that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575; accord, *In re Jason J.* (2009) 175 Cal.App.4th 922, 936.)

13

To meet the burden of proof for this statutory exception, the parent must show more than frequent and loving contact, an emotional bond with the child or pleasant visits. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.) The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive emotional attachment from child to parent that if severed would result in harm to the child. (*Ibid.*; *In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324.) The exception does not require proof the child has a " 'primary attachment' " to the parent or the parent has maintained day-to-day contact with the child. (*In re S.B.* (2008) 164 Cal.App.4th 289, 299; *In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1534-1538; *In re Casey D.* (1999) 70 Cal.App.4th 38, 51.)

We review an order terminating parental rights for substantial evidence. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) If, on the entire record, there is substantial evidence to support the findings of the juvenile court, we uphold those findings. We do not consider the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if there is substantial evidence supporting a contrary finding. (*In re Casey D.*, *supra*, 70 Cal.App.4th at pp. 52-53; *In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610.) The parent has the burden of showing there is no evidence of a sufficiently substantial nature to support the finding or order. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

14

B

Carrie and M.M. contend the potential harm to the minors from terminating their parental rights outweighed the potential benefits of adoption. The juvenile court's finding to the contrary, however, was supported by substantial evidence.

As discussed, P.M. lived with both parents at the beginning of her life, and then with M.M. after G.M. became a dependent of the juvenile court. P.M. also remained in M.M.'s care at the beginning of this proceeding. S.M. was removed from her parents' custody at birth and has never lived with them. By the time of the selection and implementation hearing, P.M. and G.M. had lived with their foster mother for 18 months and S.M. had lived with foster families her entire life. In addition, during the time that P.M. was in Carrie's custody, Carrie was in and out of jail.

During the 18 months after G.M., P.M. and S.M. were removed from their parents' custody, Carrie and M.M. maintained regular visitation and contact with the minors. However, neither parent met their burden to show a beneficial parent-child relationship sufficient to apply the exception of section 366.26, subdivision (c)(1)(B)(i). Although Carrie and M.M.'s visits were primarily positive and they were affectionate toward the minors, the minors did not show a strong parental attachment to them. S.M. primarily sought comfort from social workers and her foster mother during visits with Carrie and M.M. Likewise, G.M. and P.M. recognized Carrie and M.M. as their parents, but during visits did not seek them out to fulfill their needs or for affection. None of the children had difficulty separating from Carrie or M.M. at the end of visits.

15

"A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive some benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.) Any positive bond, warmth and affection the minors shared with Carrie and M.M. was not enough to show they had a "significant, positive, emotional attachment" to them such that terminating the parent-child relationship would result in great harm to them. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575; *In re Jason J.*, *supra*, 175 Cal.App.4th at p. 938.)

Further, Carrie and M.M. did not show that maintaining the parent-child relationship outweighed the benefits of adoption for the minors. At the time of the selection and implementation hearing, the minors had been dependents for much of their lives and had experienced much turmoil and instability. They were all doing well in the home of the foster mother, who was committed to adopting them. The minors need and deserve the stability, continuity and permanence that only an adoptive home can provide. "The reality is that childhood is brief; it does not wait while a parent rehabilitates himself or herself. The nurturing required must be given by someone, at the time the child needs it, not when the parent is ready to give it." (*In re Debra M.* (1987) 189 Cal.App.3d 1032, 1038.)

Although Carrie and M.M. contend a guardianship or long-term foster care would serve the minors' interests, adoption is the only option that provides the stability and permanence they need. (See *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1419 [Legislature has decreed guardianship is not in best interests of children who cannot be

16

returned to their parents; only adoption affords the most permanent and secure alternative]; *In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368-1369 [parents' preference to preserve family unit does not override best interests of minors in stability and security of adoptive home].)  In sum, the juvenile court was entitled to accept the social worker's opinion that the benefits of adoption for the minors outweighed the benefits of maintaining a relationship with Carrie and M.M.  (*In re Justice P.* (2004) 123 Cal.App.4th 181, 191 [child's interest in stable and permanent home is paramount after a parent's interest in reunification is no longer at issue].)  The court appropriately weighed the strength and quality of the parent-child relationship, and the detriment involved in terminating it, against the potential benefits of an adoptive home for the minors.  We cannot reweigh the evidence or substitute our judgment for that of the juvenile court.  (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 53.)[7]

DISPOSITION

The orders are affirmed.

_____

McDONALD, J.

WE CONCUR:

_____

BENKE, Acting P. J.

_____

NARES, J.

---

[7]     Having concluded there was no error as to any of the issues raised by Carrie, we need not address her claim of cumulative error.

17