Filed 3/4/21

CERTIFIED FOR PARTIAL PUBLICATION*

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ANTHONY BYRON WILLIAMS,<br><br>Defendant and Appellant. | D077174<br><br><br>(Super. Ct. No. SCN376818) |

APPEAL from a judgment of the Superior Court of San Diego County, Brad A. Weinreb, Judge. Reversed.

David M. McKinney, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Andrew S. Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

* Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of part III.B.

## I.

## INTRODUCTION

The right to counsel, enshrined in both the federal and state constitutions, guarantees a defendant the right to retain counsel of the defendant's own choosing. (*U.S. v. Gonzalez-Lopez* (2006) 548 U.S. 140, 144 (*Gonzalez-Lopez*); *People v. Crovedi* (1966) 65 Cal.2d 199 (*Crovedi*).) The California Supreme Court has repeatedly applied this principle in reversing judgments in cases in which a defendant's right to counsel of choice was unconstitutionally abridged. (*People v. Courts* (1985) 37 Cal.3d 784, 789 (*Courts*); *People v. Gzikowski* (1982) 32 Cal.3d 580, 587 (*Gzikowski*); *Crovedi*, *supra*, at p. 209; *People v. Byoune* (1966) 65 Cal.2d 345, 346 (*Byoune*).) These cases make clear that while a criminal defendant's right to counsel of choice is not absolute, that right may be overridden only under narrow, compelling, and specifically delineated circumstances. Further, a trial court must make *all* reasonable efforts to vindicate a defendant's constitutional right to counsel of choice and has "limit[ed] . . . discretion" to intrude upon that right. (*Maxwell v. Superior Court* (1982) 30 Cal.3d 606, 613 (*Maxwell*).) It is also clearly established that a violation of a defendant's right to counsel of choice is per se reversible. (*People v. Woodruff* (2018) 5 Cal.5th 697, 728 (*Woodruff*); *Gonzalez-Lopez*, *supra*, at p. 150.) The case law reflects a shared commitment to ensuring the protection of the right to counsel, one of "the most sacred and sensitive of our constitutional rights." (*People v. Ortiz* (1990) 51 Cal.3d 975, 982.)

In this case, the trial court denied Anthony Byron Williams's motion to substitute retained counsel for his appointed counsel. After the jury found Williams guilty of first degree murder, and found true a special circumstance

allegation, the trial court sentenced him to life without the possibility of parole.

On appeal, Williams claims that the trial court violated his constitutional right to counsel by denying his request to be represented by counsel of his choice and that this error requires reversal without regard to prejudice. We agree. Accordingly, we reverse the judgment and remand for further proceedings.[1]

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Factual background*[2]

At approximately 6:15 a.m. on June 5, 2017, 19-year-old Bernaldo Ramires and his father were outside of their house in Oceanside attempting to fix Ramires's car before he went to work. A man, later determined to be Williams, drove up in a white car and asked Ramires if he was "from Mesa."[3] Ramires responded, "We live in Mesa." Williams then shot Ramires in the

---

[1] In the unpublished portion of the opinion (see pt. III.B, *post*), we reject Williams's claim that the trial court's admission of his surreptitiously recorded jailhouse statements violated *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) and his right to due process, since this issue is likely to recur on remand.

We do not consider Williams's contention that the trial court failed to provide the jury with full and complete instructions and verdict forms pertaining to the lesser included offense of second degree murder, since that issue is not likely to recur on remand.

[2] We provide an abbreviated factual summary in light of the issues on appeal.

[3] According to a detective, the murder occurred in "territory" claimed by the "Mesa Gang."

3

chest, killing him. Shortly after the shooting, Williams admitted to his friend, and sometimes girlfriend, J.R., that he had shot someone.

That same morning, police reviewed surveillance video taken from a camera mounted on a telephone pole that showed a white car approach the scene of the shooting and leave immediately thereafter. Police enlarged an image from the video to determine the car's license plate number. The car belonged to J.R.'s mother. Approximately two months after the shooting, police arrested Williams. While in jail awaiting arraignment, Williams told two undercover officers posing as jail inmates that he had committed the shooting, and that he had been highly intoxicated at the time.[4]

B. *Procedural background*

As described in greater in detail in part III.B, *post*, approximately two weeks prior to the jury trial, the trial court denied Williams's motion to exclude his surreptitiously recorded jailhouse statements. In addition, as discussed further in part III.A, *post*, on the morning that the jury trial was scheduled to commence, the trial court denied Williams's request to substitute retained counsel for his appointed counsel.

At the conclusion of the trial, the jury found Williams guilty of murder (Pen. Code,[5] § 187, subd. (a)) (count 1), and maliciously discharging a firearm from a motor vehicle (§ 26100, subd. (c)) (count 2)). The jury also found true the special circumstance allegation that Williams perpetrated the murder by means of discharging a firearm from a motor vehicle with the intent to inflict

---

[4]     J.R. testified that around fifteen minutes after the shooting, Williams appeared at her residence and proceeded to drive her from Oceanside to San Diego. According to J.R., Williams did not appear to be intoxicated.

[5]     Unless otherwise specified, all subsequent statutory references are to the Penal Code.

4

death.  (§ 190.2, subd. (a)(21).)  In addition, with respect to both counts, the jury found that Williams personally discharged a firearm causing great bodily injury or death to a person (§ 12022.53, subd. (d)).

In a bifurcated proceeding, the trial court found that Williams had previously suffered a strike conviction.

The trial court sentenced Williams to life without the possibility of parole, plus 25 years to life on count 1.  The court stayed the sentence on count 2 pursuant to section 654.

## III.

## DISCUSSION

A. *The trial court's error in denying Williams's request to be represented by retained counsel of his choice violated Williams's constitutional rights and requires automatic reversal*

Williams claims that the trial court erred in denying his request to be represented by retained counsel of his choice.  He contends that this error violated his right to counsel guaranteed by the federal and state constitutions as well as his right to due process, and is reversible per se.

1. *Governing law*

a. *The relevant constitutional principles*

The Sixth Amendment to the United States Constitution provides, in relevant part:  "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."

Article I, section 15, of the California Constitution also mandates the right to counsel, stating, in relevant part:  "The defendant in a criminal cause has the right . . . to have the assistance of counsel for the defendant's defense . . . ."

Both the United States Supreme Court and the California Supreme Court have held that the constitutional right to counsel includes the right of a

5

criminal defendant who can afford to retain counsel to select a lawyer of his own choosing. (*Gonzalez-Lopez*, *supra*, 548 U.S. at p. 144 [stating that an element of the Sixth Amendment right to counsel "is the right of a defendant who does not require appointed counsel to choose who will represent him"]; *Courts*, *supra*, 37 Cal.3d at p. 789 ["The right to the effective assistance of counsel 'encompasses the right to retain counsel of one's own choosing' "]; see generally *Maxwell*, *supra*, 30 Cal.3d at p. 613 ["many precedents recognize that the constitutional right to counsel includes a reasonable opportunity for those defendants who have the necessary resources to control the designation of their legal representatives"].)

Underlying the right to select one's own counsel "is the premise that 'chosen representation is the preferred representation. Defendant's confidence in his lawyer is vital to his defense. His right to decide for himself who best can conduct the case must be respected wherever feasible.' " (*Courts*, *supra*, 37 Cal.3d at p. 789; *Maxwell*, *supra*, 30 Cal.3d at p. 613 [stating that "effective assistance is linked closely to representation by counsel of choice," and that "[w]hen clients and lawyers lack rapport and mutual confidence the quality of representation may be so undermined as to render it an empty formality"].)

Moreover, protecting the right to employ counsel of one's own choosing is not premised solely on "[e]nsuring reliability of the guilt-determining process." (*Courts*, *supra*, 37 Cal.3d at p. 789.) In addition to helping fulfill "the state's duty to [e]nsure 'fairness' in the trial," guaranteeing a defendant's right to counsel of choice is consistent with "the state's duty to refrain from unreasonable interference with the individual's desire to defend himself in whatever manner he deems best, using every legitimate resource at his command.' " (*Ibid.*)

6

The denial of a defendant's right to retained counsel of choice also amounts to a deprivation of due process of law. (See, e.g., *Byoune*, *supra*, 65 Cal.2d at p. 346 ["due process of law, as it is expressed through the right-to-counsel provisions of the state and federal Constitutions, comprehends a right to appear and defend with retained counsel of one's own choice"].)

It is also well established that "the erroneous deprivation of a defendant's right to counsel of his choice results in automatic reversal." (*Woodruff*, *supra*, 5 Cal.5th at p. 728; *Gonzalez-Lopez*, *supra*, 548 U.S. at pp. 150, 152 ["We have little trouble concluding that erroneous deprivation of the right to counsel of choice, 'with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as "structural error" ' " that is "not subject to harmless-error analysis"].)

### b. Crovedi *and its progeny*

In *Crovedi*, *supra*, 65 Cal.2d 199, the seminal California case addressing the right to counsel of one's choice, defense counsel, who had represented Crovedi "in all pretrial proceedings and during the first four days of the trial," suffered a heart attack and was hospitalized. (*Id.* at p. 201.) After a two-week recess, defendant sought a continuance of approximately two months to permit defense counsel to recover and resume the defense. (*Id.* at p. 202.)[6] The trial court denied the request. (*Id.* at p. 203.) Instead, the court ordered defense counsel's law partner to assume the defense and further ordered that the jury trial would resume in a week's time. (*Ibid.*) Both the defendant and defense counsel's partner objected to the court's orders. (*Ibid.*) Nevertheless, defense counsel's partner complied with the

---

6    Defendant provided the court with a medical report stating that defense counsel would likely be able to resume the trial approximately seven weeks after the hearing on the request for a continuance. (*Crovedi*, *supra*, 65 Cal.2d at p. 202.)

court's orders and represented defendant upon the resumption of the trial. (*Ibid.*) After the jury found the defendant guilty (*id.* at p. 204), the defendant appealed and claimed that the trial court's denial of his request for a continuance violated his right to present a defense "with counsel of one's own choice." (*Id.* at p. 205.)

The *Crovedi* court reversed the judgment, concluding that "the circumstances of this case did not justify the trial court's refusal to permit defendant to be represented by counsel of his own choice, and that therefore that refusal constituted a denial of due process of law." (*Crovedi, supra,* 65 Cal.2d at p. 208.) In reaching this conclusion, the *Crovedi* court emphasized that a defendant's right to select his own counsel may be overridden only when the following compelling reasons mandate the abrogation of that defendant's right:

> "[T]he state should keep to a necessary minimum its interference with the individual's desire to defend himself in whatever manner he deems best, using any legitimate means within his resources—and . . . that desire can constitutionally be forced to yield only when it will result in significant prejudice to the defendant himself or in a disruption of the orderly processes of justice unreasonable under the circumstances of the particular case." (*Ibid.*)

The *Crovedi* court emphasized its holding by directing the trial courts of this state to display "a resourceful diligence directed toward the protection of [the] right [to select counsel of one's choosing] to the fullest extent consistent with effective judicial administration." (*Crovedi, supra,* 65 Cal.2d at p. 209.)

In *Byoune, supra,* 65 Cal.2d 345, a defendant moved for a continuance on the day that his jury trial was scheduled to begin so that he could attempt to retain private counsel. (*Id.* at p. 346.) The defendant "admitted he was

indigent but said that his brother, who lived in Chicago, would pay for an attorney if defendant were given the opportunity to contact him." (*Ibid*.) The trial court denied the request, reasoning that if defendant was dissatisfied with his appointed counsel, he should have attempted to retain private counsel during the two months between his arraignment and trial. (*Ibid*.) The trial court also determined that the addition of a new count on the day before the commencement of the jury trial could not have surprised the defendant since the new count arose out of the same facts as the charge on which the defendant had originally been arraigned. (*Ibid*.) After the jury found the defendant guilty, the defendant appealed. (*Id*. at p. 345.)

Applying *Crovedi*, the California Supreme Court reversed the judgment. (*Byoune*, *supra*, 65 Cal.2d at p. 348.) The *Byoune* court acknowledged that "[a] defendant may not . . . demand a continuance if he is unjustifiably dilatory in obtaining counsel [citation], or if he arbitrarily chooses to substitute counsel at the time of trial [citation]." (*Id*. at pp. 346–347.) However, the *Byoune* court concluded that the record demonstrated that neither circumstance existed. As to unwarranted delay, the *Byoune* court found reasonable defendant's explanation that he had not sought retained counsel earlier because he had been "satisfied with assigned representation" as to the initial charge. (*Id*. at p. 347.) The *Byoune* court also concluded that the defendant had not arbitrarily requested a change of counsel at the time of trial, reasoning that the additional charge "justified defendant's action in asserting his right to retain chosen counsel within a reasonable time after the information was amended" and "no circumstances appear[ed] warranting the limitation of this right in the interests of efficient judicial administration." (*Id*. at p. 348.)

9

In *Courts*, the California Supreme Court again applied these principles to reverse a defendant's conviction. (*Courts*, *supra*, 37 Cal.3d at p. 796.) In *Courts*, the People charged the defendant with murder and the use of a firearm. (*Id.* at p. 787.) The trial court appointed a public defender to represent the defendant and set a jury trial for October 26, 1982. (*Ibid*.) In early September 1982, defendant attempted to retain private counsel, Attorney Swartz, but was unable to secure Swartz's services due to a lack of funds. (*Ibid*.) At an October 18 trial setting conference, the public defender requested a continuance to permit defendant to continue his efforts to hire Swartz. (*Ibid*.) The court denied the request, explaining that it had come " 'too late.' " (*Id.* at p. 788.)

On October 21, five days prior to the scheduled start of the jury trial, the defendant paid a retainer to Attorney Swartz, who agreed to take the case if the trial court would continue the trial. (*Courts*, *supra*, 37 Cal.3d at p. 788.) Attorney Swartz's office and the public defender promptly contacted the court to place a motion to substitute counsel and a motion for a continuance on calendar before the trial date, but their efforts were "unsuccessful." (*Ibid*.) The *Courts* court described those efforts as follows:

> "Swartz's partner telephoned the court and asked that the matter be placed on calendar on October 22nd for substitution of attorneys and a continuance. However, the judge's secretary brought word back from the judge that since neither Swartz nor his partner was attorney of record, the motion could not be calendared. Next, Swartz's partner approached the public defender, who attempted to place the matter on calendar for October 22nd or October 25th, the following Monday. That effort was unsuccessful." (*Ibid*.)

In a footnote immediately following this text, the *Courts* court noted that while "[n]either Swartz nor the public defender filed or attempted to file a written motion for a continuance," Swartz explained that the trial court

10

ordinarily calendared matters such as the motion for a continuance through an oral request. (*Courts, supra,* 37 Cal.3d at p. 788, fn. 2.)

On the day of trial, October 26, the public defender renewed the motion for a continuance and Attorney Swartz appeared and testified to his willingness to represent defendant. (*Courts, supra,* 37 Cal.3d at pp. 788, 791.) The trial court denied the motion. (*Id.* at p. 788.) The jury found the defendant guilty of involuntary manslaughter and found the gun use allegation true. (*Id.* at p. 789.)

On appeal, the *Courts* court stated that the issue before it was, "whether the trial court abused its discretion when it refused to grant the accused a continuance to permit him to be represented by an attorney he retained approximately one week before trial." (*Courts, supra,* 37 Cal.3d at p. 787.) In answering this question in the affirmative, the *Courts* court "emphasized that trial courts have the responsibility to protect a financially able individual's right to appear and defend with counsel of his own choosing." (*Id.* at p. 790.) In addition, the court noted that, " 'once retained, [counsel must be] given a reasonable time in which to prepare the defense.' " (*Ibid.*)

The *Courts* court also expressly held that any limitations on a defendant's right to select counsel of one's choosing are to be "carefully circumscribed." (*Courts, supra,* 37 Cal.3d at p. 790.) The court reasoned:

> "In view of the importance of these rights [i.e., the right to select counsel and for counsel to have a reasonable time to prepare] and the severe consequences which flow from their violation, the trial courts are required to 'make all reasonable efforts to ensure that a defendant financially able to retain an attorney of his own choosing can be represented by that attorney.' [Citation.] . . . .

11

"Any limitations on the right to counsel of one's choosing are carefully circumscribed. Thus, the right 'can constitutionally be forced to yield *only* when it will result in significant prejudice to the defendant himself or in a disruption of the orderly processes of justice unreasonable under the circumstances of the particular case.' [Citations.] The right to such counsel 'must be carefully weighed against other values of substantial importance, such as that seeking to ensure orderly and expeditious judicial administration, with a view toward an accommodation reasonable under the facts of the particular case.' [Citation.]" (*Ibid.*)

The *Courts* court also specifically held that a trial court's discretion to deny a request for a continuance that is related to the assertion of the defendant's right to retain counsel of his choice is similarly curtailed:

"Limitations on the right to continuances in this context are similarly circumscribed. Generally, the granting of a continuance is within the discretion of the trial court. [Citations.] A continuance may be denied if the accused is 'unjustifiably dilatory' in obtaining counsel, or 'if he arbitrarily chooses to substitute counsel at the time of trial.' [Citation.]

"However, 'a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality.' [Citation.] For this reason, trial courts should accommodate such requests—when they are linked to an assertion of the right to retained counsel—'to the fullest extent consistent with effective judicial administration.' [Citation.]

"In deciding whether the denial of a continuance was so arbitrary as to violate due process, the reviewing court looks to the circumstances of each case, ' "particularly in the reasons presented to the trial judge at the time the request [was] denied." ' " (*Courts, supra,* 37 Cal.3d at pp. 790–791.)

12

In applying these principles to reverse defendant's conviction, the *Courts* court concluded that the October 18 request for a continuance represented a "timely assertion of [defendant's] intentions." (*Courts, supra,* 37 Cal.3d at p. 792.)[7] The court also noted that the defense had contacted the trial court prior to the date set for trial to request a continuance and to substitute Attorney Swartz for appointed counsel after finalizing Attorney Swartz's retention. (*Id.* at p. 793.) Under these circumstances, and in light of the law discussed above, the court concluded, " '[There] was neither lack of diligence in seeking a replacement [for appointed counsel] nor undue delay in apprising the court of the situation and seeking [a] continuance.' " (*Id.* at p. 794.) The court reasoned:

> "[Defendant] took reasonable and timely steps to create a relationship with private counsel. His representatives attempted to protect that relationship by moving for a continuance. Thus, the state's interest in ensuring an expeditious resolution of the case became far less compelling." (*Ibid.*)

Further, the *Courts* court noted that "there were no circumstances which warranted the limitation of [defendant's] right to counsel based on considerations of judicial efficiency." (*Courts, supra,* 37 Cal.3d at p. 794.) In support of this conclusion, the Supreme Court noted that the record did not demonstrate that a "continuance would have *significantly* inconvenienced the court or the parties." (*Ibid.,* italics added.) Accordingly, since a defendant's "right to chosen counsel [citation] must be respected, even when a byproduct of a concrete and timely assertion of that right is some disruption in the process," the *Courts* court concluded that the trial court had erred in denying

---

7    As noted in the text, the trial was scheduled to begin approximately one week later, on October 26. (*Courts, supra,* 37 Cal.3d at pp. 787.)

the defendant's request for a continuance to obtain counsel of his choice. (*Id.* at p. 795.)

In sum, the California Supreme Court has "repeatedly" reversed judgments in cases in which a defendant's right to be represented by counsel of his choice was infringed. (*Gzikowski, supra*, 32 Cal.3d at pp. 587, 589 [reversing judgment where "[n]o prospect of possibly impairing efficient judicial administration appeared that was sufficient to overcome defendant's interest in obtaining counsel of his choice"]; *Courts, supra*, 37 Cal.3d at p. 796; *Byoune, supra*, 65 Cal.2d at p. 348; *Crovedi, supra*, 65 Cal.2d at p. 205.)

2. *Standard of review*

As in *Courts, supra*, 37 Cal.3d at page 789, "[t]his court must decide whether the trial court's failure to grant a continuance[8] constituted an abuse of discretion in the face of [defendant's] well-documented desire to be represented by private counsel and counsel's willingness to undertake that task."

" ' "[T]he scope of [a court's] discretion always resides in the particular law being applied, i.e., in the 'legal principles governing the subject of [the] action . . . .' Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an 'abuse' of discretion." ' [Citation.]" (*Williams v. Superior Court* (2017) 3 Cal.5th 531, 540.)

---

8    As will be made clear in part III.A.3, *post*, although the trial court formally denied Williams's motion to substitute Attorney Collins as his counsel in place of Attorney Lopez, Attorney Collins was willing to substitute in the case only if the trial court would agree to continue the trial. Thus, as the People characterize the question on appeal in their respondent's brief, we must determine whether the trial court properly denied Williams's "request for a continuance to substitute in private counsel." (Capitalization omitted.)

14

As described in part III.A.1, *ante*, the principles of law governing a defendant's request for a continuance, when "linked to an assertion of the right to retained counsel" (*Courts*, *supra*, 37 Cal.3d at p. 791), have been carefully delineated in *Crovedi* and its progeny. As the California Supreme Court has explained, California decisions "*limit severely* the [trial] judge's discretion to intrude on [a] defendant's choice of counsel" even where the court is attempting to "eliminate potential conflicts, ensure adequate representation *or serve judicial convenience*." (*Maxwell*, *supra*, 30 Cal.3d at p. 613, italics added.)

Accordingly, in this appeal, we determine whether the trial court transgressed the stringent limitations on the denial of a defendant's right to counsel of choice in denying Williams's request for a continuance to permit Attorney Collins to represent him in this matter.

### 3. *Factual and procedural background*

#### a. *Attorney Collins's motion to substitute in as Williams's retained counsel*

On September 3, 2019, the morning set for the commencement of trial, Attorney Collins made an oral motion to substitute in as Williams's counsel in place of appointed counsel, Attorney Lopez.

The court indicated that it was aware that Attorney Collins was going to request to substitute in as counsel for Williams and noted that the People had filed a written opposition to the motion to substitute, which the court had reviewed.

#### b. *The People's written opposition*

In their opposition, also filed on September 3, the People outlined the procedural history of the case, noting that the case was 2 years and 11 days old and that the trial date had been continued on four prior occasions. The

People also noted that the trial court denied Williams's *Marsden*[9] motion on August 22, 2019, and that Attorney Collins informed the prosecutor that she had been retained to represent Williams on August 28, six days earlier.

The People's opposition focused primarily on their efforts to secure J.R.'s presence at the trial and the inconvenience that a continuance would cause J.R. and the People. The People stated:

> "The People have spent considerable resources to bring material witness [J.R.] to court. She lives far out of state and has stated that she cannot come to San Diego without caring for a small step-child she must bring with her. The District Attorney's Office has arranged for the child to be cared for while she testifies.
>
> "Moreover, [J.R.] expressed that being out of work for an entire week was a financial hardship to her. Nevertheless, she has agreed to fly here, be put up in a hotel, and testify. [The prosecutor] went so far as to write a letter to her employer so that no adverse action would be taken against her.
>
> "The People have arranged roundtrip flights for her and her step-child, a hotel room for an entire week, and will be paying per diem costs associated with her stay. The total amount that has and will be spent by the County of San Diego on [J.R.] alone is more than $3,602. This amount does not include the overtime costs associated with a District Attorney Process server, who, on September 1, 2019, picked up [J.R.] and the small child from San Diego airport. He then transported them to their hotel. While the People have [J.R.] under subpoena for this trial, serving out of state witnesses and securing their actual attendance in court is an uncertain and complicated task. Importantly, the numerous continuances have taken an emotional toll on

_____

9     (*People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).) On August 6, 2019, Williams's counsel requested a *Marsden* hearing, seeking to replace his appointed counsel. The court held the *Marsden* hearing on August 22, and denied the motion that same day.

[J.R.]. She has reported bouts with anxiety because of this case."

The People also discussed the stress and frustration that the victim's family had experienced due to the ongoing proceedings.

In addition, the People stated that one police officer involved in the case, who was currently available to testify at trial, had retired and that the officer had "extensive surgery and long-term travel plans," after the trial.

After discussing the relevant case law, the People contended that Williams had "over two years to retain an attorney but did not do so until the trial had effectively beg[u]n and motions had been ruled upon by the court." The People further noted that Attorney Lopez was ready to try the case and that she had skillfully defended Williams in pretrial proceedings. The People maintained that Williams had been "demonstrably dilatory," in his efforts to retain counsel and that his mother's retention of Attorney Collins "was likely a surprise to [Williams]."

The People concluded by arguing:

> "The delay that would be caused by allowing this last-minute substitution of counsel would cause hardship to the People as it took considerable time and taxpayer resources to secure [J.R.'s] attendance for this trial. A lot of time, effort, and resources have gone into making sure this trial is completed by September 13, 2019. Importantly, the victim's family demands that this case go to trial. To quote Gladstone, 'justice delayed is justice denied.'"

c. *The hearing on the motion to substitute counsel*

The trial court began the hearing on the motion to substitute counsel by asking Attorney Lopez whether she was ready to proceed to trial. Attorney Lopez responded:

> "Your honor, I think given your honor heard the *Marsden*, heard Mr. Williams' grievances, one of those having to do

17

with the breakdown in communication, although at that point I didn't think there was a breakdown in communication — I think given that he has now retained counsel, I think proceeding with the trial at this point — I don't know that Mr. Williams will be mentally prepared throughout the trial because basically it's his desire to have me replaced; the fact that his mother has now secured the funds and has retained counsel on his behalf."

The trial court confirmed that the People were ready to proceed to trial, and then asked Attorney Collins whether she had been retained to represent Williams. After Attorney Collins responded in the affirmative, the court asked Collins when she would be ready to go forward with the trial. Attorney Collins responded that she would not be ready to proceed until January. Collins explained that she had several trials scheduled through November, and that she would use the month of December to "ensure that [she was] ready and that we could proceed to trial in this very serious case, where this young[10] man's life is at stake."

The court replied by noting that this matter was "significantly more serious" than the charges at issue in Attorney Collins's other cases that were set for trial. The court continued, "I understand, given the nature of the charges, it would not be unreasonable to give some additional time to you in order to get up to speed," and asked Attorney Collins when she had been retained.

Attorney Collins responded:

"The day that I notified counsel.[11]

_____

10    Williams was 23 years old at the time of trial.

11    As noted in part III.A.3.b, *ante*, in their opposition, the People stated that Attorney Collins notified them on August 28 that she had been retained, six days before the trial.

18

"And if I may, one of the problems with a case of this nature is trying to retain counsel. I mean, [Williams's mother], who retained me, certainly does not have the means. And it was only when she spoke to me about a month ago or six weeks ago, when she realized that communication was breaking down between her son and his attorney, that she asked me for my fee, which basically is ridiculously low. I don't charge what other attorneys charge. But then, again, I don't take payments. That gave her some hope.

"She began working to see what she could do to retain me. And it still did not look good, until about a week before I notified counsel that I would request authority and permission to come on board, that she met with me with a host of friends and somehow convinced me to take payments, which I don't normally do in this kind of case.

"The night before I was retained and notified counsel, I sat and watched [Williams's mother] with a cell phone and a stack of credit cards — I'm unfamiliar with red dot cards, things like that, as she attempted to max cards out on a Paypal account in order to pay for me to come in.

"I think, based upon talking to her, that she has exercised a great deal of diligence in trying to secure counsel for her son, that he would be happy with, that would give him the attorney he wanted as he fights for his life in this case.

"I understand that cause for concern is my trial schedule. But then, again, as I read over the statement prepared by the prosecutor, I note that it is a matter of cost which, in the large scheme of things, is not significant and convenient [sic]. I see nothing in here that indicates that witnesses will be unable to appear and testify in January. As a matter of fact, there are a few witnesses that are unable to testify now that may be available in January.

"I see most of this —"

19

After the trial court briefly interrupted Attorney Collins to state that the People were ready to proceed to trial notwithstanding the unavailability of one of their witnesses, Attorney Collins continued:

> "I understand. What I'm saying is, so far it doesn't appear to be hardship or impossibility of witnesses coming in. So far everything appears to be convenien[ce]. And I believe that in a case of this magnitude, where this young man is essentially fighting for his life, he has the right to have an attorney of his choice, as long as his family — that he has exercised diligence, not done everything possible but exercised reasonable diligence in order to secure new counsel.
>
> "It appears from everything I've seen in this case, in the papers filed by the prosecutor and in a letter submitted to me by the defense attorney, that this case has proceeded basically to accommodate the convenience of other parties' schedules. It accommodated the convenience of counsel when she was moving. It accommodated convenience of this court's schedule by having in limine motions early. Everything so far has been in terms in the context of convenience and accommodation."

Attorney Collins continued by explaining that she understood that the court's "processes are important," but that, "I think in terms of a case where a young man is fighting for his life, four months is not unreasonable."

After the trial court reiterated that it might not "give [Attorney Collins] four months because you have other matters that you have to address and you're unwilling to put this one — make this one to have the priority that it demands," the court asked Attorney Collins, "How much time do you need to prepare for this case?"

Attorney Collins responded by inquiring as to the amount of discovery in the case. The court asked the prosecutor for a response.

20

The prosecutor responded that the discovery was "voluminous," and that the case was complex. After further discussions between the court and the prosecutor concerning the numerous tape recordings contained in the discovery, the court stated that, if it were to grant the motion to substitute, it would not be inclined to permit Williams to relitigate the admissibility of Williams's jailhouse statements. The court added, "I'm trying to figure out exactly how much time counsel realistically needs if this case is put on the front burn[er] and becomes the priority that counsel's suggesting it needs to be."

The prosecutor responded that Attorney Collins could not "truly know" how long it would take her to be ready to try the case until she had reviewed the discovery.

At this point in the hearing, Attorney Lopez discussed the reasons why the case had been pending for approximately two years. Attorney Lopez emphasized that it was not until almost a year after the arraignment that the district attorney's office made the determination that it would not seek the death penalty in the case. Attorney Lopez also explained that the People had not timely provided the defense with transcripts of statements from various witnesses.

The court stated that the transcripts were now available, and returned to the question of how long Attorney Collins would realistically need to be ready for trial.

Attorney Collins responded by emphasizing her strong work ethic, including providing specific examples of her industriousness.[12] Attorney

---

12    For example, Attorney Collins stated:

> "I can give the court an example of my work ethic, because
> I'm not familiar with this court. I know this court is not

21

Collins also emphasized her extensive trial experience, noting that she had worked as a prosecutor for 25 years and had tried five death penalty cases. Attorney Collins stated:

> "I would be ready to go as soon as — I think that, realistically speaking, January is what I need. This young man deserves to have somebody by his side who believes in him, that he believes in, and that person — I'm not suggesting the public defender doesn't believe in him. But whatever the cause, things have broken down between them, and he is in the fight of his life. He should have the attorney that he feels comfortable with in this case.

> "I will be ready in January. I can inform the court that I will. I also understand the in-limine motions have been heard. I understand the principles of law of the case. I understand that those rulings will hold, absent new and different evidence or a change in circumstances."

The court responded by asking Attorney Collins whether she would "be prepared to go to trial in 60 days[.]"

Collins replied by stating that she could not "ignore the reality of [her] trial schedule," and that a personal issue was also contributing to her

---

> familiar with me. I was appointed on a very large case . . . about seven years ago and that case involved, for example, an opening statement by the prosecutor that lasted a week, to present all the facts and hundreds of thousands of pages of documents.

> "I did not waive time in that case, and I proceeded to trial two months after the preliminary hearing. . . . And my client did not suffer. He was the only defendant that was acquitted in that case."

inability to try the case in that time frame.[13]  After a brief recess, Attorney Collins added that the reason that her upcoming trial schedule was so full was that there has been an absence of judges able to try matters in August due to system-wide judicial training and certain judges having had personal emergencies.

The trial court then asked Attorney Lopez whether there was anything in the factual or procedural background of the case described in the People's opposition to the motion to substitute[14] that she wanted to address.

Attorney Lopez stated that Williams had indicated to her on August 6 that he wanted to request a *Marsden* hearing.  Attorney Lopez contacted the court clerk that same day requesting a date for the *Marsden* hearing.  However, due to the prosecutor's unavailability, the earliest date on which the *Marsden* hearing could be set was August 19, and it was subsequently delayed until August 22 because of courtroom unavailability.  Attorney Lopez explained that after the court denied the *Marsden* motion and ruled that Williams's jailhouse statements would be admissible, she attempted to meet with Williams later that day.  According to Attorney Lopez, Williams declined that meeting.  Lopez stated that she intended to meet with Williams on August 28, but on that day, she received a call from the prosecutor informing her that Attorney Collins had been retained to represent Williams.

Attorney Lopez explained that the delay in getting the *Marsden* hearing adjudicated and Williams's feeling that he was being denied the

---

[13]    Attorney Collins explained that she owned a horse sanctuary and that the manager of the sanctuary had recently had a heart attack and was unable to take care of the horses.

[14]    We described the People's opposition in part III.A.3.b, *ante.*

23

attorney of his choice had detrimentally impacted her ability to prepare the case since August 6. Attorney Lopez explained:

> "I don't know where Mr. Williams'[s] head is at. I don't think that in one day I can get him back to where we were prior to the *Marsden* being denied. So[,] I have grave concerns with going forward with this trial when there is an attorney who can step in as his trial counsel."

Attorney Lopez added, "I don't understand the rush to press forward when there would be no prejudice to the prosecution."

At this point, the prosecutor reiterated his argument that there was an insufficient basis to continue the trial to permit Attorney Collins to substitute in as counsel. The prosecutor emphasized that the case had been continued in the past at the defense's request and due to settlement negotiations. The prosecutor also stated that there was no indication at the time of the August 6 *Marsden* request that Attorney Collins was "waiting in the wings" in the event that the motion were denied. The prosecutor added that efforts to retain Attorney Collins had stemmed from Williams's mother, rather than Williams. The prosecutor summarized his opposition to the motion by stating that case law supported the conclusion that a defendant having "lost confidence" in his attorney was an "insufficient reason[ ] to grant a day-of-trial continuance for the retention of a new attorney."

### d. *The trial court's ruling*

At the conclusion of the hearing on the motion to substitute counsel, the trial court denied the motion, ruling:

> "All right. I appreciate the arguments of counsel. I understand this is a relatively serious case, and I appreciate the procedural history that has been provided to the court. After hearing from all counsel, reviewing the pleadings, and reviewing the appropriate case law, I think that counsel coming in on the day of trial is untimely.

24

"There was even some discussion with Ms. Collins about if she was — the court had asked a couple of times, because the court felt, even if it was timely, a four-month delay on a case already two years old is [a] little unreasonable. It seemed to be that much of the delay was occasioned by other matters that were already scheduled. I understand the reasons for that. But even [on] a couple of occasions the court tried to find out from Ms. Collins, putting aside all those other matters, giving this case the priority it needs, how much time and focus on this case exclusively, how much time would be needed to prepare, and I couldn't get a definitive answer from that. I know there was an allusion to a case that needed 60 days to prepare.

"But, you know, this is a situation where Ms. Collins hasn't been exposed to any of the discovery in the case. She hasn't seen anything of the case. She is going to be spending the next three months devoted to the other cases. Using the month of December, getting ready for a case of this magnitude with this exposure is I think an insufficient amount of time. I think it would be reasonable to infer that, once she was able to devote time to the case, that coming in . . . [in] January would necessitate additional delays.

"Those are just kind of observations being made, but the point the court wants to make is that, had the position been that: I'm ready to go or I'm going to set everything else aside and give this case the priority it needs, I need a little bit of time to prepare —we are not even at that point because there was — you know, this is a case in which it was scheduled — it's a two-year-old case, scheduled to go forward today. Counsel coming in on the day of trial after in limines have been done, saying: I'm coming on board, but I don't know anything about the discovery. At this point in time, the court's not going to — the court's going to find that's simply untimely at this point in time.

"I recognize and I understand that perhaps after the court ruled on the *Marsden* motion the defendant — at which time there's nothing in the record to suggest that the

defendant was seeking representation from another attorney, the — following the ruling of the *Marsden*, following the ruling of the in limines, the defense did not indicate to the court that it was not ready to go forward. At that point in time, everybody anticipated that we would be going forward when the court got back from vacation on today's date, and it's only after that *Marsden* ruling was made that the court became aware of the fact that now there's an attorney that apparently was — services were retained by the defendant's mother.

"I think it's dilatory; I think it's untimely. Even if it wasn't untimely, the additional time being requested by counsel I think is unreasonable. So[,] the court's going to deny the request to substitute in Ms. Collins at this point in time."

   e. *The postruling hearing concerning the motion to substitute counsel*

On September 4, Attorney Lopez supplemented the record with additional information pertaining to the motion to substitute counsel. She began by stating that the People's opposition suggested that the defense had moved to continue four different trial dates. According to Lopez, this was incorrect. Attorney Lopez explained that the trial dates had been continued at various readiness conferences for several different reasons, including exploring potential settlement of the case, "either [the prosecutor's] wife's birthday or his anniversary," and the need for the defense to explore retaining an expert.

Attorney Lopez also stated the following with respect to the defense's efforts to alert the court of the fact that Attorney Collins had been retained to represent Williams:

"Then the last monkey wrench, if you will, would be Wednesday, August 28th, when I'm informed that Attorney . . . Collins has been retained at great cost to the family. I understand the retainer amount was $20,000. At

26

that point, immediately upon learning that, I e-mailed the court clerk, requesting an ex parte to get an indicated, because it was — because Ms. Collins was requesting to come in so late in the game — an ex parte so I could get an indicated from the court whether they were likely to grant or deny that motion, making all the difference in the world in terms of pushing forward with meetings with Mr. Williams during the Labor Day weekend and even on Labor Day itself.

"I also sought counsel within my office in terms of other attorneys who have been in this position, how likely is the court, you know, to grant a subbing in this late in the game."

The court interjected:

"And again, for purposes of the record, at that date, we were dark because this — because I was on vacation during that period of time. I know that you contacted our clerk who contacted me. I know Department 5 was aware of it, but no — at that point in time, no motion —there was no — you made a comment about ex parte — getting an ex parte order so we could get this resolved in advance as possible. There was no effort to seek relief in Department 5 at that time or contact supervising to see if another judge might be able to resolve the issue while I was on vacation, or there was no formal motion or request filed by Ms. Collins nor was ever one filed in person.

"The first time that Ms. Collins sought to appear in the court was when she appeared and orally made the request yesterday. I wanted to make sure that the record reflected that procedural information. Go ahead."

Attorney Lopez continued:

"Yes. That is correct. I can only reference informal conversations that I had with my supervisor Matt Roberts, who said he had a meeting. I don't think it was specifically for this or if they just happened to be in the same chambers, but that Judge Kirkman indicated to him that

he thought that the request to have the substitution should be granted; that ultimately the decision was going to be Judge Weinreb's decision because the trial was assigned to Judge Weinreb for all purposes. I relied on that representation that this request to sub in, even this late in the game, because of the exposure, because the exposure in this case is life without the possibility of parole. This is coming from my supervisor, who is talking to the judge in Department 5 who sends out the cases."

4. *In denying Williams's motion to substitute counsel, the trial court abused its limited discretion to deny a defendant's request for a continuance so that the defendant can be represented by counsel of his choice*

The trial court stated that it denied the motion to substitute counsel because the request was "dilatory" and "untimely," and because the "time being requested by [Attorney Collins] . . . [was] unreasonable." For the reasons stated below, we conclude that, given the "severely" limited discretion of a trial court in this context (*Maxwell*, *supra*, 30 Cal.3d at p. 613), the court exceeded the carefully delineated "circumscribed" limitations on its authority to deny Williams's request to be represented by counsel of his choice and failed to "accommodate [Williams's] request[ ] . . . 'to the fullest extent consistent with effective judicial administration.' " (*Courts*, *supra*, 37 Cal.3d at pp. 790–791.)

a. *Williams was not dilatory in bringing his motion to substitute counsel*

First, while the court stated that Williams's request was "dilatory," the court pointed to no circumstances to support such a finding, the People have identified no such circumstances, and our own searching review of the record has produced no evidentiary support for the finding. Not only is there no

evidence that Williams's motion represented an effort to cause delay,[15] there is undisputed evidence, recounted below, that Williams's motion to substitute counsel was made soon after the denial of the *Marsden* motion, as soon as his mother was able to obtain the funds necessary to retain Collins, and reflected a genuine desire on Williams's part to replace his appointed counsel.

To begin with, Attorney Lopez indicated at the hearing on the motion to substitute counsel that her relationship with Williams had broken down,[16] explaining that "Mr. Williams['s] feeling that he doesn't have the attorney of his choice has been detrimental to this case in terms of my ability to prepare." Attorney Lopez emphasized her point by stating that she had "*grave concerns* with going forward with this trial when there is an attorney who can step in as his trial counsel." (Italics added.)

Williams's request for a *Marsden* hearing on August 6, approximately a month before the trial, further supports the conclusion that he was genuinely dissatisfied with Attorney Lopez's representation. At the *Marsden* hearing, Williams testified that there had been "a total breakdown in communication between me and my attorney that resulted in a complete loss of trust."

Finally, Attorney Collins's unrebutted statements that Williams's mother had contacted her at least a month prior to the trial date and had undertaken significant efforts to secure Attorney Collins's representation also strongly supports the conclusion that Williams brought the motion to

---

[15]    Nor is there any other evidence in the record that Williams's actions during any of the *prior* proceedings in the case reflected an intent to delay the proceedings.

[16]    Attorney Lopez also explained that prior to the *Marsden* proceedings, she and Williams had had "a very good relationship."

substitute because he genuinely desired new counsel, not because he wanted to delay the trial.[17]

In *Byoune*, the California Supreme Court concluded that a defendant had not been "unjustifiably dilatory," in requesting a continuance on the day of trial in order to attempt to retain counsel, given the changed circumstances in the case. (*Byoune*, *supra*, 65 Cal.2d at p. 346.) Similarly, in this case, the record reflects that Williams's request to substitute counsel arose from his growing dissatisfaction with appointed counsel and his desire to be represented by a different attorney, and demonstrates that the request was not "dilatory."[18] (See *Maxwell*, *supra*, 30 Cal.3d at p. 613 ["[w]hen clients

---

[17] The record demonstrates that Williams's family did not have the funds to retain Attorney Collins earlier. As noted in part III.A.3.c, *ante*, Attorney Collins stated that Williams's mother had first contacted her a month or six weeks prior to the date set for trial and inquired about Collins's fee, and that it had taken Williams's mother several weeks after that to come up with sufficient funds to retain Collins. Attorney Collins added:

> "[Williams's mother] met with me with a host of friends and somehow convinced me to take payments, which I don't normally do in this kind of case.

> "The night before I was retained and notified counsel, I sat and watched [Williams's mother] with a cell phone and a stack of credit cards — I'm unfamiliar with red dot cards, things like that, as she attempted to max cards out on a Paypal account in order to pay for me to come in."

[18] Thus, this case is distinguishable from *People v. Turner* (1992) 7 Cal.App.4th 913 (*Turner*) on which the People rely in their brief. (See *id.* at p. 919 [denying defendant's request to remove counsel, made for the first time at his probation revocation hearing, and stating "the vagueness of his complaints supported the court's apparent finding that the motion was motivated not by any genuine dissatisfaction with counsel but by a desire to delay the trial"].) Unlike in *Turner*, for the reasons stated in the text, the

and lawyers lack rapport and mutual confidence the quality of representation may be so undermined as to render it an empty formality"])

> b. *Williams's motion to substitute counsel was timely given all of the circumstances of the case*

The trial court also found that Williams's request was "untimely." While the "lateness of [a] continuance request," may be a "significant factor which justifie[s] a denial where there were no compelling circumstances to the contrary," (*Courts, supra,* 37 Cal.3d at pp. 792, fn. 4, 801), in this case, as in *Courts,* the defense took reasonable steps to retain substitute counsel in advance of the trial, accomplished that retention prior to the trial, and took steps to promptly inform the court and the People of the requested substitution six days before the trial was scheduled to begin.

The record contains "compelling circumstances" (*Courts, supra,* 37 Cal.3d at p. 792, fn. 4.) that mitigate any tardiness of Williams's motion. As described in part III.A.3.c, *ante,* approximately a month before the trial, Williams sought to obtain a different appointed attorney via his request for a *Marsden* hearing. However, the trial court was not able to conduct the *Marsden* hearing until August 22, just two weeks prior to the trial. The delay in hearing the *Marsden* was attributable to the prosecutor's vacation schedule and the fact that a courtroom was not available to hear the motion earlier. At approximately the same time Williams requested a *Marsden* hearing, Williams's mother began to attempt to obtain new counsel for Williams by contacting Attorney Collins and inquiring about her fee. In addition, as described in footnote 17, *ante,* the record indicates that Williams's mother engaged in considerable efforts over the next several

---

record unequivocally demonstrates the genuineness of Williams's desire to obtain substitute counsel.

weeks to obtain the funds necessary to secure Attorney Collins's representation once the *Marsden* motion was denied and it became apparent that Williams's desire for different counsel would not be achieved via new appointed counsel. In sum, the delay in resolving the *Marsden* motion—a delay not attributable to Williams, constituted a significant factor that the court was obligated to consider in evaluating the timeliness of Williams's request to substitute counsel.

Further, although the case had been pending for approximately two years, given the seriousness of the charge and the potential sentence of life in prison without parole for Williams,[19] we see nothing that suggests that the case was proceeding at an unduly slow pace, and certainly nothing indicating that any delay in the resolution of the case was attributable to any gamesmanship on Williams's part or to any improper tactics on the part of his counsel.

In addition, as in *Courts*, Williams retained new counsel nearly a week *prior* to the trial. Attorney Collins testified that she was retained on August 28, six days prior to the trial date. (Compare with *Courts*, *supra*, 37 Cal.3d at p. 793 [stating that new counsel was retained on October 21, five days prior to the trial].) Thus, as in *Courts*, by the time of the motion to substitute, the trial court "was not confronted with the 'uncertainties and contingencies' of an accused who simply wanted a continuance to *obtain* private counsel." (*Id.* at p. 791.)

Further, while the defense did not "file[ ] or attempt[ ] to file a written motion for a continuance," (*Courts*, *supra*, 37 Cal.3d at p. 788, fn. 2), Attorney

---

[19]    In denying the motion to substitute counsel, the trial court stated, "I understand this is a *relatively* serious case." (Italics added) In fact, Williams received a sentence of life without the possibility of parole, the harshest penalty in our criminal justice system, short of death.

Lopez and Attorney Collins both acted promptly to alert the court and the prosecutor to the fact that Attorney Collins had been retained *prior* to the trial. (*See id.* at pp.792–793, and fn. 4. [distinguishing the defense's "unsuccessful" but "diligent" efforts to "attempt[ ] to calendar a continuance request in advance of trial," with the "eve-of-trial, day-of-trial, and second-day-of-trial requests" in other cases].)

Attorney Collins informed the prosecutor on August 28 that she had been retained that day. In addition, Attorney Lopez contacted the trial court's clerk on August 28 to apprise the court of the requested substitution of counsel and to obtain an indicated ruling. While the trial court (Judge Weinreb) was on vacation during the period from August 28 through September 3, Judge Weinreb indicated that his clerk informed him of Attorney Lopez's request while he was on vacation. Obviously, the fact that Judge Weinreb was on vacation in the days immediately preceding the trial is a circumstance that is not attributable to Williams. Moreover, although Judge Weinreb suggested at the September 4 hearing that Attorney Lopez should have requested that another judge handle the matter while he was on vacation,[20] there is nothing in the record that indicates that Judge Weinreb's clerk or anyone else conveyed this message to Attorney Lopez at any time prior to the motion to substitute. In any event, Attorney Lopez expressly stated that her supervisor *had* contacted the judge presiding in Department 5, who indicated to Lopez's supervisor both that in his view, the motion to substitute "should be granted" and that *Judge Weinreb* would have to make the final decision. Thus, the record indicates that the defense undertook the

---

[20]    During the postruling hearing, Judge Weinreb stated, "There was no effort to seek relief in Department 5 at that time or contact supervising to see if another judge might be able to resolve the issue . . . ."

33

action that Judge Weinreb suggested at the September 4 hearing would have been the appropriate course of action, but was unable to get a definitive ruling prior to the day set for trial. In short, as in *Courts*, defense counsel's informal efforts to alert the trial court to Williams's request to substitute retained counsel for his appointed counsel nearly a week prior to the start of trial were reasonable.

This case is thus distinguishable from *People v. Jeffers* (1987) 188 Cal.App.3d 840, 850 (*Jeffers*), on which the People rely, in which this court affirmed a denial of a continuance in order to obtain retained counsel where "[n]othing in the record suggest[ed] [defendant] made a good faith, diligent effort to obtain retained counsel before the scheduled trial date." (*Id.* at p. 850.) Unlike in *Jeffers*, as described above, in this case, the defendant, through his mother, *did* make good faith, diligent efforts to obtain retained counsel more than a month prior to trial, and in fact retained new counsel six days prior to the trial.

Further, Williams's motion to substitute retained counsel for his appointed counsel is not similar to the defendant's motion for a continuance in *People v. Keshishian* (2008) 162 Cal.App.4th 425 (*Keshishian*), on which the People also rely, in terms of the timeliness of the motion. In *Keshishian*, the defendant " 'surprised' " the trial court on the day set for trial by stating, " 'I've lost confidence pretty much in my attorneys. I'm really looking for another trial attorney—to hire an attorney for trial. I would ask the court . . . if I can please get a continuance to hire some other lawyers, please.' " (*Id.* at p. 428.) The defendant had "neither identified nor retained new counsel," (*id.* at p. 429) "numerous defense requests for continuances had been granted,"

34

(*id.* at p. 428) and the crime had occurred six years prior to the trial.[21] (*Ibid.* at fn. 10.) The Court of Appeal concluded that the trial court had properly "reject[ed] appellant's last-minute attempt to discharge counsel and delay the start of trial." (*Id.* at p. 429.) Unlike in *Keshishian,* in this case, the trial court and the prosecutor were both on notice of Williams's desire for a new attorney *prior* to trial, Williams had identified and retained an experienced attorney who was willing to represent him, the case not been pending for an unusually long period of time, and Williams had not engaged in any dilatory conduct.

Thus, the circumstances of this case share many similarities with those in *Courts*, in which the California Supreme Court concluded that the defendant had diligently obtained retained counsel and timely informed the court of such retention, and are clearly distinguishable from the Court of Appeal cases such as *Turner, Jeffers,* and *Keshishian*, on which the People rely. (See *Courts*, *supra*, 37 Cal.3d at p. 794.) In sum, there is no evidence that Williams "arbitrarily" (*Byoune*, 65 Cal.2d at p. 346) chose to seek substitute counsel at the time of trial.

c. *The length of the requested continuance did not constitute a sufficient basis on which to deny the motion to substitute*

We are left to consider whether "the state's interest in ensuring an expeditious resolution of the case" was sufficiently compelling under the circumstances of this case to override Williams's right to be represented by counsel of his own choice. (*Courts*, *supra*, 37 Cal.3d at p. 794 [stating that because defendant diligently retained counsel to replace appointed counsel and informed the court of such retention, "the state's interest in ensuring an

---

[21]    The delay was due in part to the defendant having fled the country. (*Keshishian*, *supra*, 162 Cal.App.4th at p. 428, fn. 10.)

expeditious resolution of the case became far less compelling"].)  In conducting this inquiry, we are guided by the principle that a defendant's " 'right to decide for himself who best can conduct the case must be respected wherever *feasible*,' " (*id.* at p. 789, italics added) and to "the *fullest extent* consistent with effective judicial administration."  (*Crovedi*, *supra*, 65 Cal.2d at p. 209, italics added.)  When considered in light of this standard, we conclude that the length of the continuance that Attorney Collins requested did not constitute a sufficient basis on which the trial court could properly deny the motion to substitute.

To begin with, Attorney Collins provided a simple and reasoned explanation for the length of the proposed continuance.  She stated that she had recently been retained to represent Williams and that she had an "extensive trial schedule" that would keep her "in trial," until "the end of November."  She explained that she would use December "to ensure that I'm ready and that we could proceed to trial in this very serious case, where this young man's life is at stake" in January.  Attorney Collins was a seasoned trial attorney who expressly assured the trial court, "I will be ready in January.  I can inform the court that I will."  Attorney Collins cannot be faulted for representing defendants in jury trials that were set prior to her being retained in this case, and her request to have the month of December to prepare for a trial of this complexity and seriousness after she completed those other trials was not unreasonable.

On the other hand, while the People demonstrated that it would be *inconvenient* for J.R. if the trial were continued, they did not demonstrate that she, or any other witness would be *unavailable* if the court granted Williams's motion.  In any event, the trial court did not deny the motion out of a concern for J.R.'s convenience, or because of any other inconvenience to

36

the People; instead, the court expressly contemplated granting a shorter continuance, and there is nothing in the record that suggests that either J.R. or the People would have been any more inconvenienced by a longer continuance than by a shorter one.

Moreover, while the trial court's comments at the hearing on the motion to substitute counsel concerning the length of the requested continuance appear to reflect irritation with Attorney Collins for having a full trial schedule and purportedly failing to prioritize this case over her other cases, in ruling on the motion, the court did not refer to any harm to the People's case that the proposed delay might cause and did not point to any specific harm to the administration of justice that would result from such a delay. During the hearing, the court made the following statements concerning Attorney Collins's inability to try the case prior to January:

- "One would assume that part of the responsibility of coming on board as retained counsel is being ready to proceed. You knew that the trial was set for today. I understand, given the nature of the charges, it would not be unreasonable to give some additional time to you in order to get up to speed . . . ."

- "I don't necessarily know how reasonable it is to ask for that much time essentially due to the convenience of counsel's schedule, because counsel has other matters that counsel has to address."

- "So[,] if I'm not going to give you four months because you have other matters that you have to address and you're unwilling to put this one — make this one to have the priority that it demands, given the serious nature of the charges, how much time do you need to prepare for this case?"

- "I think four months may be an unreasonable amount of time to continue this matter, in light of the

37

discussion that we previously had.  I was trying to gauge how much time she needed to come on board."

- "The court may not be inclined to give a four-month continuance, if the court's inclined to allow that to occur.  I'm trying to figure out exactly how much time counsel realistically needs if this case is put on the front burn[er] and becomes the priority that counsel's suggesting it needs to be."

- "I guess the question from the court is: if you were to give this case priority over your other matters, give it the priority it deserves, given the significant amount of exposure the defendant is facing, how much time do you realistically need to be prepared to go to trial?"

- "So if you were to give this case the same amount of due effort and attention you gave to the case that you referred to, why would you not be prepared to go to trial in 60 days?"

However, while the court clearly expressed its frustration with the proposed delay, there is nothing in the record that reveals any reason why a continuance until January would cause "a disruption of the orderly processes of justice unreasonable under the circumstances" of this case.  (*Crovedi*, *supra*, 65 Cal.2d at p. 208.)  The trial was not expected to be particularly long,[22] no codefendants were involved, and neither the court nor the People identified any calendaring issues that would arise if the trial were to be rescheduled for January.  In sum, while a continuance until January would cause some amount of inconvenience for witnesses, the court, and the victim's

---

[22]    During the hearing on September 4 (see pt. III.A.3.e, *ante*), the trial court stated, "This is scheduled to be a two-week trial."

family,[23] a defendant's constitutional "right to chosen counsel [citation] must be respected, even when a byproduct of a concrete and timely assertion of that right is some disruption in the process." (*Courts*, *supra*, 37 Cal.3d at p. 795.)

Accordingly, we conclude that the trial court erred in permitting expedience to take precedence over Williams's right to be represented by counsel of his choice under the circumstances of this case.

5.  *The error requires reversal*

The erroneous deprivation of Williams's right to counsel of his choice is structural error that is per se harmful and requires an automatic reversal. (*Woodruff*, *supra*, 5 Cal.5th at p 728; *Gonzalez-Lopez*, *supra*, 548 U.S. at p. 150.)

B.  *The trial court properly admitted Williams's jailhouse statements*

Williams claims that the trial court erred in admitting recorded jailhouse statements that he made to two undercover officers who were posing as fellow inmates.[24]  The statements included an admission that he committed the shooting.  Williams maintains that his statements should have been suppressed because "*Miranda* was violated," and that his "admissions were coerced and involuntary . . . ."

---

[23]    In particular, we understand the People's argument that the victim's family desired to see the matter concluded.  However, when one considers that the 23-year-old defendant was facing life in prison without parole, we cannot say that a delay of a few months "would have *significantly* inconvenienced the court or the parties." (*Courts*, *supra*, 37 Cal.3d at p. 794, italics added.)

[24]    As noted in part I, *ante*, while we reverse the judgment for the reasons stated in part III.A, *ante*, we address this issue in order to provide guidance to the trial court since the issue is likely to recur on remand.

1. *Standard of review*

" 'In reviewing the trial court's denial of a suppression motion on *Miranda* . . . grounds, " ' "we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence.  We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained." ' " [Citations.]' " (*People v. Jackson* (2016) 1 Cal.5th 269, 339.)  Similarly, "[v]oluntariness is a legal question subject to independent review; a trial court's related factual findings are upheld if supported by substantial evidence." (*People v. Winbush* (2017) 2 Cal.5th 402, 452 (*Winbush*).)

2. *Governing law*

a.  Miranda *and its progeny*

The Fifth Amendment of the United States Constitution provides a criminal defendant with a privilege against self-incrimination.  (U.S. Const., 5th Amend. ["nor shall [any person] be compelled in any criminal case to be a witness against himself"].)

"*Miranda* . . . and its progeny protect the privilege against self-incrimination by precluding suspects from being subjected to custodial interrogation unless and until they have knowingly and voluntarily waived their rights to remain silent, to have an attorney present, and, if indigent, to have counsel appointed.  [Citations]." (*People v. Gamache* (2010) 48 Cal.4th 347, 384.)  In *Rhode Island v. Innis* (1980) 446 U.S. 291, 301 (*Innis*), the United States Supreme Court defined interrogation for purposes of *Miranda* as "not only . . . express questioning, but also . . . any words or actions on the part of the police (other than those normally attendant to arrest and custody)

40

that the police should know are reasonably likely to elicit an incriminating response from the suspect." (Fn. omitted.)

In *People v. Fayed* (2020) 9 Cal.5th 147 (*Fayed*), the California Supreme Court noted that under United States Supreme Court precedent, *Miranda* warnings are not required before a suspect engages in a what he believes to be a private conversation with someone he does not suspect is a law enforcement officer:

> "[T]he [United States Supreme Court] has held that at least where no prior invocation is in effect, '[c]onversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*. The essential ingredients of a "police-dominated atmosphere" and compulsion are not present when an incarcerated person speaks freely to someone whom he believes is a fellow inmate. Coercion is determined from the perspective of the suspect.' (*Illinois v. Perkins* (1990) 496 U.S. 292, 296 [(*Perkins*)].) In other words, '*Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner. . . . [¶] *Miranda* was not meant to protect suspects from boasting about their criminal activities in front of people whom they believe to be their cellmates.' (*Id.* at pp. 297–298 [defendant showed 'no hint of being intimidated by the atmosphere of the jail' and 'was motivated solely by the desire to impress his fellow inmates']; see *People v. Tate* (2010) 49 Cal.4th 635, 685–686 [(*Tate*)].)" (*Id.* at p. 165.)

The California Supreme Court has repeatedly applied this principle in discussing the admissibility of statements made by a defendant to a person whom the defendant does not suspect to be a government agent. (See, e.g., *Fayed*, *supra*, 9 Cal.5th at p. 165; *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 284 [stating that although defendant "misplaced his trust in confiding in [an inmate acting as government agent], [defendant's] tape-

41

recorded statements were voluntary and free of compulsion" and noting that "the United States Supreme Court has rejected ' "the argument that *Miranda* warnings are required whenever a suspect is in custody in a technical sense and converses with someone who happens to be a government agent" ' "; *Tate, supra,* 49 Cal.4th at p. 686 ["Both 'custody' and 'police questioning' are necessary to invoke *Miranda,* and both concepts are viewed from the suspect's perspective. (*Perkins, supra,* 496 U.S. 292, 296.) Even when the suspect is in the process of a custodial interrogation, voluntary statements to someone the suspect does not believe is a police officer or agent, in a conversation the suspect assumes is private, simply does not involve one of these two critical concerns"]; *People v. Davis* (2005) 36 Cal.4th 510, 555 (*Davis*) [defendant's surreptitiously recorded statements to cellmates made immediately after detective interrogated defendant in cell were admissible because "when he made these statements to his cellmates there was no longer a coercive, police-dominated atmosphere, and no official compulsion for him to speak"].)

        b. *Voluntariness*

"State and federal constitutional principles prohibit a conviction based on an involuntary confession. [Citations.] 'The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made. [Citations.] In determining whether a confession was voluntary, " '[t]he question is whether defendant's choice to confess was not "essentially free" because his [or her] will was overborne.' " [Citation.]' [Citation.] . . . [¶] A confession's voluntariness depends upon the totality of the circumstances in which it was made." (*Winbush, supra,* 2 Cal.5th at p. 452.)

While a person surreptitiously working as an agent of the government may engage in coercive threats that vitiate the voluntariness of a confession (see *Arizona v. Fulminante* (1991) 499 U.S. 279, 287 (*Fulminante*) [coercion due to "credible threat of physical violence" if defendant did not confess]), a person secretly acting as a government agent does not engage in coercive or improper tactics merely by "coax[ing] and prodd[ing]," a defendant to speak. (*Fayed, supra,* 9 Cal.5th at p. 166.) It is only when the agent uses improper tactics that overcome a defendant's will that it may be said that a defendant's confession is involuntary. (*Id.* at pp. 165–166 [stating that although informant was "much more than a passive listener," confession was voluntary since "defendant was neither compelled into revealing his role in [victim's] murder, nor was he coerced into hiring a hitman to kill [second victim]"].)

3. *Factual and procedural background*

    a. *The* Perkins *operation*

On August 21, 2017, shortly after Williams's arrest and prior to his arraignment or invocation of any *Miranda* rights, police engaged in an operation premised on the tactics approved in *Perkins, supra,* 496 U.S. 292. During the operation, Williams made a series of incriminating statements pertaining to the shooting to undercover officers posing as fellow inmates.

The operation began with police conducting a fake lineup during which Williams heard a person, whom Williams was led to believe was the father of the victim,[25] positively identify Williams as the shooter.

Police then took Williams to a holding cell, which was occupied by an undercover agent posing as an inmate. After Williams and the undercover agent spoke for a while, a second undercover agent posing as an inmate was

_____

[25] The person "identifying" Williams was actually a police officer.

placed in the cell.  The undercover agents pretended to be experienced criminals with knowledge of the criminal justice system.  After Williams told the undercover agents that he was expecting to be interviewed by police, one of the undercover agents told Williams that, in his experience, there were three highly incriminating types of evidence that could doom a case:  DNA evidence, video evidence, and eyewitness evidence.

Shortly thereafter, a detective entered the cell and informed Williams that police had obtained strong evidence indicating that he was the shooter, including finding his DNA on the shell casings discovered at the scene, video showing him driving "[J.R.'s] car," and a positive identification from the lineup.[26]  The detective informed Williams that they would be interviewing him shortly.

After the detective left the cell, one of the undercover agents said, "They got him.  They got him."  Williams continued to speak with the undercover agents about the case, and admitted that the car in the video belonged to his ex-girlfriend.  When one of the undercover agents asked Williams, "Did you wear gloves?"  Williams responded, "Yeah."  Shortly thereafter, Williams said, "We shouldn't . . . be talking about this."

After one of the undercover agents was taken out of the cell and later returned to the cell, he told Williams that he had overheard the police officers happily discussing how they had caught a friend of Williams's with whom Williams had stayed with after the shooting.  Shortly thereafter, Williams related several details about the shooting to the undercover agent, including that Williams had not known the victim, that he had asked the victim "

---

[26]    The People do not dispute that the police did not in fact have the DNA or lineup evidence.  While the police did have video that showed J.R.'s car at the scene of the shooting, the People do not contend that Williams could be identified from the video.

'where he was from,' " and that the victim had said he was from "Mesa." Williams also admitted to having disassembled the gun after the shooting. Williams added, "I swear every time I close my eyes, like . . . I just hear the gunshots." Williams told the undercover agents that he was highly intoxicated at the time of the shooting, having used cocaine and ecstasy and consumed alcohol prior to the shooting.

        b.   *Williams's motion to exclude his statements obtained via the* Perkins *operation*

Prior to the trial, the defense filed a motion to exclude the surreptitiously recorded statements that Williams made to the undercover agents. Among other arguments, Williams claimed that the "jailhouse interrogation by police," (boldface & capitalization omitted) violated *Miranda* and rendered his statements involuntary and inadmissible as violative of due process. Williams claimed that the "law enforcement deception in this case far exceeded that done in the *Perkins* case" and requested that the trial court suppress his jailhouse statements for all purposes.

The People filed an opposition in which they argued that Williams's statements were obtained in compliance with *Perkins.* They argued in part:

> "[Williams] confessed in a jail cell after speaking to undercover [d]etectives who he had befriended. In this case, [Williams's] confessions were not relayed to openly known [d]etectives who had violated [Williams's] *Miranda* rights. Rather, [Williams] confessed only to undercover [d]etectives wearing jail blues whom he believed to be friends going through similar legal troubles. Because there was no police-dominated atmosphere during the course of [Williams's] confessions, *Perkins* (and its progeny cases) controls the outcome in this case. Accordingly, [Williams's] in-jail confessions should be admitted at trial."

The trial court held a hearing at which the parties reiterated the arguments advanced in their briefs.

c. *The trial court's ruling denying Williams's motion to exclude his jailhouse statements*

At the conclusion of the hearing, after discussing the relevant case law, and the circumstances pertaining to the statements Williams made to the undercover agents,[27] the trial court denied Williams's motion. The court reasoned in part, "Given the fact that [Williams] didn't know he was speaking to government agents—there's no reason to assume the possibility that there might be—that he might have felt coerced. On this record, the court does not find a coercive atmosphere."

d. *The admission of the statements*

At trial, the People played Williams's recorded jailhouse statements to the jury.

4. *Application*

Williams makes several related arguments in support of his contention that the trial court erred in denying his motion to suppress his statements. None is persuasive.

First, Williams contends that police engaged in the "functional equivalent" of an interrogation by placing him in a lineup and confronting him with inculpatory evidence. (See *Innis, supra*, 446 U.S. at p. 299 ["one of the practices discussed in *Miranda* was the use of lineups in which a coached witness would pick the defendant as the perpetrator. This was designed to establish that the defendant was in fact guilty as a predicate for further

---

[27] The trial court indicated that it had read a transcript of the statements and the parties agreed that the court could rule on the motion without taking live testimony or listening to the recording of the statements.

46

interrogation"]; *People v. Sims* (1993) 5 Cal.4th 405, 443 [officer engaged in functional equivalent of interrogation by "confronting defendant with the evidence linking him to the crimes"].)  Yet, even assuming that police tactics in placing Williams in a fake lineup and reviewing the damning evidence against him amounted to an interrogation under *Innis* and *Miranda*, Williams points to no statements that he made in response to such interrogation *to persons whom he understood to be police officers.*

In the absence of evidence that Williams made any statements to persons whom he understood to be police officers, Williams's primary argument is that he continued to be subjected to the functional equivalent of an interrogation when he made statements to the *undercover agents.*  For example, Williams argues that he was subjected to "an integrated scheme of layered encounters" that "morph[ed] into one well-orchestrated interrogation."  He maintains, "This tactic – merging the fake lineup into the cell interrogation, and that, in turn, into the promptings by the undercover agents – took the *Perkins* operation far beyond the passive police conduct addressed by *Perkins* itself."

We are not persuaded.  In *Davis*, a police detective came to the defendant's cell and recounted inculpatory evidence against him, suggesting that the defendant's fingerprint had been found on a weapon (an Uzi). (*Davis*, *supra*, 36 Cal.4th at p. 553.)  After the detective left, the defendant made incriminating statements to his cellmates, which were surreptitiously recorded.  (*Id.* at p. 554.)  While concluding that the detective had engaged in the functional equivalent of interrogation by recounting the evidence against the defendant to him (*id.* at p. 555), our Supreme Court concluded that the

admission of the defendant's statements made *to his cellmates* did not violate

*Miranda*.[28]  The court reasoned:

> "After the comment about the Uzi, Detective DeAnda left
> defendant's jail cell.  Thereafter, defendant, unaware that
> police officers were listening to and recording his
> statements, said to his cellmates: 'The fingerprints on the
> Uzi is mine.  I know that mother fucker [the Uzi] has been
> handled since I handled it.'  Under the circumstances,
> defendant 'consider[ed] himself in the company of cellmates
> and not officers,' and the coercive atmosphere of custodial
> interrogation was lacking.  (*Illinois v. Perkins, supra,*
> 496 U.S. at p. 296.)  Viewing the situation from defendant's
> perspective [citations], when he made these statements to
> his cellmates there was no longer a coercive, police-
> dominated atmosphere, and no official compulsion for him
> to speak.  Thus, the admission of defendant's incriminating
> statements made after Detective DeAnda left the cell did
> not violate his rights under *Miranda*."  (*Ibid.*)

Similarly, in this case, at the time that Williams made the

incriminating statements to the undercover agents, Williams was no longer

in a "coercive, police-dominated atmosphere," and was "[under] no official

compulsion . . . to speak." (*Davis, supra,* 36 Cal.4th at p. 555; accord, *Tate,*

*supra,* 49 Cal.4th at pp. 685–686 [rejecting defendant's attempt to distinguish

*Perkins* on the ground that "he was 'in the throes' " of a custodial

interrogation when he made incriminating statements during a break in the

interrogation to his friend because "one who voluntarily speaks alone to a

friend, even during a break in a custodial interrogation, has no reason to

_____

28    The *Davis* court did conclude that a comment that the defendant made
to the *detective* in response to the interrogation should have been suppressed.
(*Davis, supra,* 36 Cal.4th at p. 555.)  However, as noted in the text, in this
case, Williams does not point to any statements that he made to a person
whom he understood to be a police officer.

48

assume, during the private conversation, that he or she is subject to the coercive influences of *police* questioning")].)[29]

Williams also argues that "each of the facets of the operation were overtly coercive as well, all but certain to elicit incriminating responses from appellant when set in the context of the larger operation, the coercion expanding with each new component." We disagree. While it is clear that the police subjected Williams to numerous ruses and lies, " '[t]he use of deceptive statements during an investigation does not invalidate a confession as involuntary unless the deception is the type likely to procure an untrue statement.' " (*Fayed, supra*, 9 Cal.5th at p. 165.) Williams points to nothing in the record that suggests that any of the tactics used in this case were of the type likely to produce an untrue statement. Finally, unlike in *Fulminante*, on which Williams relies, in which the court found that the "fear of physical violence, absent protection from his friend (and Government

---

[29] Williams also supports this argument by citing Justice Liu's dissenting statement from the California Supreme Court's denial of review in *People v. Valencia* (Dec. 11, 2019, No. S258038) (statement by Liu, J. dissenting from denial of review) (*Valencia*). Justice Liu's statement does not advance Williams's argument. In his statement, Justice Liu acknowledged that "surreptitious questioning of a suspect *before* he has invoked any *Miranda* rights does not negate the voluntariness of his choice to speak (*Perkins, supra*, 496 U.S. at p. 298) . . . . " (*Ibid.*, first italics added.) That is the circumstance present in this case since Williams does not claim that he invoked his *Miranda* rights at any point prior to making the statements at issue.

Justice Liu also noted that "our courts of appeal have extended *Perkins* to hold that surreptitious questioning of a suspect is permissible even *after* the suspect has invoked *Miranda* rights and remains in custody." (*Valencia, supra*, No. S258038 (statement by Liu, J. dissenting from denial of review), second italics added.) While Justice Liu indicated in his statement that he would grant review in order to consider the validity of such case law, our case does not present that issue, because, as discussed above, Williams never invoked his *Miranda* rights.

agent) . . . motivated [defendant] to confess," (*Fulminante, supra,* 499 U.S. at p. 288), Williams fails to demonstrate that his confession was the result of any form of improper coercion.

Accordingly, we conclude that the trial court properly determined that Williams's jailhouse statements were admissible.

IV.

DISPOSITION

The judgment is reversed.


AARON, J.

WE CONCUR:

McCONNELL, P. J.

DATO, J.